# EXHIBIT A

**SUPREME COURT OF THE CITY OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| *In the Matter of the Application of*<br><br>JEFFREY BALLABON, *Petitioner*,<br><br><br>*For an Order and Judgment Pursuant to CPLR Article 75*<br><br>—*against*—<br><br>STRAIGHT PATH IP GROUP, INC. f/k/a INNOVATIVE COMMUNICATIONS TECHNOLOGIES, INC.,<br><br>      *Respondent*. | Index No.<br><br><br>**VERIFIED PETITION<br>TO VACATE<br>ARBITRATION AWARD** |

Petitioner Jeffrey Ballabon alleges and says:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff  Jeffrey Ballabon is an individual residing at 352 Redmont Road, West Hempstead, New York 11552.

2.      Defendant Straight Path IP Group, LLP is a Delaware limited liability company claiming a principal place of business at Hickory Park Dr. Suite 218, Glen Allen, Virginia and which does business or did business as Innovative Communications Technologies ("ICTI").

3.      This is a proceeding brought pursuant to CPLR § 7511 to vacate and overturn an arbitration award.

4.      Based on the facts alleged herein, this court has jurisdiction pursuant to CPLR §§ 301 and 302, and venue is proper pursuant to CPLR § 503.

## VERIFIED ALLEGATIONS

**A.      ICTI, the IDT Patents, and the CEO Problem**

5.      ICTI was formed on March 14, 2011 for the purpose of receiving a valuable portfolio of eleven U.S. patents and 14 foreign patents then owned by IDT, a public corporation controlled and dominated by Howard Jonas.

6.      The patents cover, among other things, innovations for VoIP and point-to-point communications between computers over a network, technology which has become ubiquitous on computers, mobile phones, cars, televisions and appliances.

7.      IDT had spent many years attempting to monetize its patents, but the results had only been an expensive failure, costing tens of millions of dollars in legal fees arising from unsuccessful litigation as well as hundreds of millions of dollars in opportunity costs and a massive wasting of the limited lifespan of the patents.

8.      ICTI's first board members were Joyce Mason, General Counsel of IDT and Howard Jonas's sister, and Ira Greenstein, a long-time friend and confidant of Jonas and who served as president of IDT from 2001-2011.

9.      Greenstein had also been appointed president and treasurer of the newly-formed ICTI, positions he held until July 2013.

10.      In the months leading up to ICTI's formation, IDT officers and directors made presentations at investor "road shows" and held "investor days" to generate interest in IDT's new spin-off.

11.     On March 15, 2011, ICTI filed an SEC Form 10 with the Securities and Exchange Commission to register its securities for public trading.

12.     At the time of these road shows and the Form-10 filing, however, ICTI still had no CEO.

13.     Around this same time, i.e., early 2011, Greenstein, ICTI's president, was pursuing as CEO Mr. Ballabon, a well-known and respected business executive and lobbyist with past stints in major organizations and an extraordinary "Rolodex."

14.     Greenstein and other IDT officers, including Jonas, his in-house legal advisor Menachem Ash and long-time IDT executive Liore Alroy, placed great emphasis, while wooing Mr. Ballabon, in emphasizing to him the fact that ICTI had become a public company separate and apart from IDT.

15.     Greenstein and, through him and ultimately through Jonas's counsel, Ash, as well as Jonas himself, also explicitly represented to Mr. Ballabon repeatedly that the continued separation of the two entities and development of ICTI as a publicly-held company was the entire premise of its business plan and their proposal to him to serve as CEO.

16.     This key representation both was of critical importance in causing Mr. Ballabon to consider and, ultimately, to accept their offer and, indeed, to execute the contract with ICTI only once it was legally a public company.  There were several reasons for this.

17.     The first reason for Mr. Ballabon's reliance on these representations concerning the spin-off of ICTI was that it assured him of the independence he required as a condition to considering the position and enabled him to accept, as deferred

compensation, a substantial five-percent in the new entity in return for a relatively modest CEO salary.

18.     The second reason was the compelling and self-evident observation that under Jonas control the value of the patents would always be deeply suppressed as there remained the identical continued counter-assertion risk against Jonas's interests that had cost IDT so much money and almost destroyed the company in its previous ill-fated attempt to monetize the patents.

19.     In light of that compensation scheme, the Employment Agreement also allowed Mr. Ballabon to supplement his income by doing other outside work.

20.     This concession was consistent with IDT's own internal determination, prior to its identification of Mr. Ballabon as a candidate for the CEO position at ICTI, that the appropriate compensation model for ICTI was consistent with a less-than-full-time chief executive who would be willing to serve as needed in return for relatively modest cash compensation in addition to a considerable stake in the prospective value of the new entity.

21.     For this reason, the main incentive provided to Mr. Ballabon was the anticipated appreciation of what was promised to him would be a five percent stake in the new public company he would be heading whose sole assets would be, upon their transfer from IDT, its demonstrably lucrative patents.

22.     Mr. Ballabon began his work for ICTI in good faith in late February or early March 2011. He immediately commenced recruiting a blue-chip board of directors and worked with ICT's counsel and other employees to effectuate the spin off.

23.     On May 17, 2011, once ICTI was a public company, Mr. Ballabon and ICTI executed the Employment Agreement with an effective date of May 5, 2011.

24.     The Employment Agreement provided that Mr. Ballabon would serve as Chief Executive Officer of ICTI for a term of four years.

25.     The Employment Agreement also required that Mr. Ballabon be appointed to the Board of Directors of ICTI.

26.     Under the Employment Agreement, Mr. Ballabon's compensation was a combination of a base salary set at $250,000 annually, plus benefits, with eligibility for increases and performance bonuses at the discretion of the Board ("Base Salary"), plus an equity grant ("Equity Grant").

27.     The Employment Agreement required ICTI to grant Mr. Ballabon incentive stock options to purchase shares of ICTI in an amount equal to five percent (5%) of ICTI's total equity capitalization.

28.     The options were to vest in equal monthly installments, and would be immediately and automatically vested in full upon a change of control, resignation by the Executive for "Good Reason" or termination by ICTI without "Cause," as defined therein.

29.     Under the terms of the Employment Agreement, ICTI was required to grant Mr. Ballabon his first stock option no later than 15 days from the date of the Agreement.

30.     The Equity Grant also referred to additional terms and conditions set forth in a duly authorized stock option plan which, the Agreement provided, was to be duly adopted by ICTI and ratified by its stockholders.

5

31.     The Equity Grant also referred to terms and conditions in a "related option agreement," referred to as the "Equity Instruments."   The Equity Instruments were to provide that the exercise price per share was to be equal to the fair market value of the shares, which, it was understood, were to publicly traded -- on the date of the grant, i.e., within 15 days from the date of the Employment Agreement.

**B.     The Spin-Off is Reversed**

32.     ICTI, however, never fulfilled its obligation to compensate Mr. Ballabon with equity in ICTI.

33.     In fact, on June 20, 2011, barely six weeks after Mr. Ballabon's start date, IDT, at the direction of Jonas, upended the key premise foundation of its arrangement with Mr. Ballabon.

34.     This was done by reversing the spin-off of ICTI which had been in progress and which, pursuant to the Securities and Exchange Act, had already effectuated the establishment of ICTI as a public company – folding ICTI back into a wholly-owned subsidiary of IDT.

35.     By this action, Jonas and IDT made Mr. Ballabon exactly what he had been promised he would not be when he was induced to sign the Employment Agreement with ICTI:  An employee of IDT and its CEO, Howard Jonas.

36.     The decision to change the public status of ICTI was made without consulting Mr. Ballabon, the CEO of ICTI and a member of the ICTI board.

37.     The decision to change the public status of ICTI was made, moreover, without so much as providing him any advance notice of the move, despite his position as CEO of ICTI.

38.     Thus while Mr. Ballabon had been offered, and accepted, a compensation package whose primary attraction was a five percent share of that company's publicly-traded stock, to be awarded in monthly installments that explicitly contemplated the full panoply of legal compliance with the issuance of such stock under the securities laws, now no such company existed; no such plan had ever been formed; and he had not received a single share or option to purchase shares after four months of work including six weeks of service under the Employment Agreement.

39.     Because of these actions, Mr. Ballabon would, in fact, never receive the stock in ICTI that was promised to him and which was explicitly recited in the Employment Agreement to be the essential inducement to secure his agreement to accept the CEO position at ICTI.

40.     Moreover, because of these actions, ICTI never, during the period of Mr. Ballabon's employment, came truly to control or benefit from the assets which, according to IDT's pre–Employment Agreement pitch to prospective investors, the SEC and, of course, Mr. Ballabon, were its raison d'être:  The IDT patents.

**C.      The IDT Board of Directors Once Again Decide to
Spin-Off and Grant Howard Jonas Equity in ICTI**

41.     Having relied, reasonably, on the representations set forth above in accepting the position as ICTI's CEO, Mr. Ballabon was in the position after the reversal of the spin-off of having to tolerate ICTI's serial non-compliance with the Employment Agreement with him in return for a series of repeated promises by the same individuals, who explicitly and over a period of months reiterated to Mr. Ballabon the intention that ICTI would, in a relatively short time, in fact be spun off as originally promised.

42.     In reliance on this second series of promises, and now having compromised his bargaining position considerably by virtue of his reliance on the first set of now discredited promises to the same effect, Mr. Ballabon remained on the job as ICTI's CEO and applied himself to it with his characteristic intellect, energy and integrity.

43.     The reasonableness of Mr. Ballabon's reliance on these new promises was not either a result solely of duress or of misplaced trust.  Rather, Mr. Ballabon had come, since becoming CEO of ICTI, to an even deeper understanding of the extent to which a spin-off of ICTI was absolutely necessary in order for its patent assets ever to come close to realizing what remained of their market value.

44.     Mr. Ballabon also understood that his efforts at establishing credibility for the company and establishing relationships outside IDT's circle were beginning to bear fruit; that no one within the IDT organization was remotely qualified to take over his position from him; and that no one from outside IDT was likely to take on the position at that juncture.

45.     Indeed, Mr. Ballabon's efforts to do his job and maximize the value of the ICTI patent portfolio reached a crescendo at a June 18, 2012 presentation to the IDT Board of Directors at which Mr. Ballabon demonstrated backed by months of comprehensive analysis that the only way to successfully monetize the parents, assert them against deep-pocket infringers and avoid charges of corporate waste by IDT shareholders was to revisit the original plan to spin ICTI off into a separate public company.

46.     As a result of this presentation, IDT's controlling shareholder Howard
Jonas and the IDT Board, despite being placed in the awkward position of publicly
reversing its reversal of the spin-off of a year before, were persuaded by Mr. Ballabon's
presentation and accepted his recommendation.

47.     One month later, in July 2012, at a special meeting of the IDT Board of
Directors, the Board, in agreement with Mr. Ballabon, resolved to set the target date for
the spin-off of ICTI as August 25, 2012, and directed Mr. Ballabon to issue a press
release immediately, which  Mr. Ballabon did.

**D.      Howard Jonas's Son Davidi Joins ICTI and**
**Mr. Ballabon's Duties are Diminished.**

48.     During this same period, under Mr. Ballabon's leadership at ICTI, the
trend by which IDT's serial attempts to monetize their patent portfolio resulted only in
waste, expense and embarrassment was reversed and a coherent monetization plan was
put into place.

49.     This plan was executed by Mr. Ballabon and, for the first time, began to
bear tangible fruit – i.e., successful litigation, successful settlement, establishment of a
highly favorable royalty rate – during the time of his service as CEO of ICTI.

50.     During this same period, at Jonas's request, Mr. Ballabon was also
providing services for a number of Jonas's other companies as well as assisting Jonas
with his well-known political interests.

51.     Despite this, in or around August of 2012, Davidi Jonas, the son of IDT's
CEO Howard Jonas, decided to enter ICTI business and, as was his practice, Howard
Jonas determined to have his offspring start at the very top.

52.    The younger Jonas's qualifications for executive management were not obvious.  Having dropped out of college several years earlier and without ever earning a degree, he had no business education, training or experience.

53.    After being "ordained" as a "rabbi" by an unaccredited rabbinical school funded by his father, he had spent the better part of his adult life as a part time religious studies teacher in a school whose board chairman was Howard Jonas, a post not unrelated to the substantial financial support the elder Jonas provided to the institution.

54.    To Howard Jonas, however, Davidi Jonas was preferable as ICTI CEO to the Yale Law School graduate, Senate Commerce Committee counsel, Presidential appointee and senior CBS Corp. executive then occupying the CEO slot at ICTI and driving the IDT patents toward profitability for the first time ever.

55.    The sole reason for Jonas's preference, and the subsequent actions alleged here, was that Davidi Jonas was Howard Jonas's son, and Davidi Jonas wanted Mr. Ballabon's job.

56.    Thus on August 6, 2012, within two or so weeks of Davidi's arrival at IDT, Howard Jonas emailed Mr. Ballabon a message reading as follows:

I don't think things are working out between you and IDT. I am disappointed in the lack of progress and effort. I note that thou [sic] spend much of your working time on Twitter and the like. I understand it will be your feeling that you are working hard, are hamstrung by the legal situation and are only doing politics on your personal time. Regardless from my point of view I would not be protecting shareholder value to leave you in charge of ICTI. I therefore suggest we sit down to work out something amicably without having to get into the issue of cause. I look forward to hearing from you. Sorry, Howard

57.    This email represented the first criticism expressed to Mr. Ballabon of his work.

10

58.     In fact, the email was a ploy by Howard Jonas to create a written pretext for giving his son Mr. Ballabon's job.

59.     Following this, and throughout September and October, both Jonases communicated with Mr. Ballabon concerning his discharge in favor of Davidi, though consistently reiterating that Mr. Ballabon's ouster was both inevitable and not actually related to performance.

60.     In moments of candor,  Howard Jonas acknowledged to Mr. Ballabon that the source of the pressure on him to replace Mr. Ballabon with Davidi Jonas at ICTI was Howard Jonas's wife who, according to Jonas, thought it would make their son Davidi feel good to be CEO.

61.     Meanwhile, on a separate track, Jonas began to explicitly demand that Mr. Ballabon not only cooperate in the breach of his employment contract in terms of running ICTI, but that he turn over the equity to which he was contractually entitled as well.

62.     By this point, under the vesting schedule set by the Employment Agreement, Mr. Ballabon already was entitled to almost 2% of ICTI's shares and, if terminated without cause, would have immediately been vested at the full 5% level.

63.     Mr. Ballabon, understandably, declined to surrender his equity interest and Howard Jonas offered no consideration or other reason why he should.

### E.     Mr. Ballabon is Terminated Without Cause

64.     Howard Jonas, committed to replacing Mr. Ballabon with his son and seeking to pressure Mr. Ballabon, soon added a new demand to his campaign of intimidation, insisting that Mr. Ballabon step aside as ICTI's CEO in favor of Davidi but that Mr. Ballabon continue rendering service to Jonas's other interests business interests

and continue to permit his good name and reputation to be associated with ICTI by "retaining" the title of "Chairman" of ICTI.

65.    Jonas's suggestion, while allowing Ballabon to remain nominally employed, served mainly to  exploit the value of Mr. Ballabon's name for purposes of ICTI's future investors while minimizing Mr. Ballabon's ability to actually execute his responsibilities as CEO.

66.    At the same time, Jonas's solution would at once humiliate Mr. Ballabon and undermine the entire premise of his hiring, i.e., the minimization of the counterassertion risk, because ICTI would remain under Jonas family control.

67.    As a result,  the patents never be properly monetized, which of course directly and negatively undermined the value of Ballabon's equity interest.

68.    In mid-October 2012, Jonas, claimed that he was now willing to let Mr. Ballabon keep half of his 5% equity share, pressuring Mr. Ballabon to name the price at which he would sell back the other half of the equity in ICTI to which he was entitled under the Employment Agreement in exchange for which Jonas also would have the balance of the remaining 2.5% (approximately .5%) vest immediately..

69.    On October 26, 2012, at a meeting called by Mr. Jonas, Mr. Ballabon made a proposal, as Jonas demanded, for the sale of half of his equity in ICTI.

70.    Jonas's reaction, however, was simply to state to Mr. Ballabon, "You're terminated," which was followed by a clear, unambiguous termination email to him from Jonas to the same effect and informing Mr. Ballabon that Davidi Jonas was replacing him effective immediately.

71.     Mr. Ballabon was, therefore, terminated as the CEO of ICTI on October 26, 2012.

**F.      IDT Attempts to Retract the
         Termination Without Cause And Provide Notice to Cure.**

72.     Under the terms of the Employment Agreement, by terminating Mr. Ballabon without cause, IDT / ICTI had obligated itself to pay Mr. Ballabon severance and, more significantly, triggered the immediate vesting of Mr. Ballabon's rights to the value of all 5% equity.

73.     Unfortunately for Jonas, however, this was precisely the opposite of what he had been trying to do for months in terms of clawing back equity. Realizing after consultations with counsel, the extent of Jonas's blunder, IDT then compounded it by creating a meaningless and fraudulent document – a transparent bad faith attempt to reverse the written and verbal termination of Mr. Ballabon by which it purported to "terminate" him again in a manner that would provide a rationale for grabbing back not 2.5%, but the entire 5% equity share to which he was entitled and withholding the severance he was now owed under the Employment Agreement.

74.     In order to "achieve" this, Davidi Jonas, styling himself the Executive Vice President of ICTI – a position to which he was not appointed by the company's own management, i.e., its CEO, Mr. Ballabon – signed a letter dated November 6, 2012 purporting to give Mr. Ballabon 30 days' notice to "cure" various alleged employment deficiencies and misconduct.

75.     This letter was sent by Davidi Jonas to Mr. Ballabon almost two weeks after Mr. Ballabon had already been summarily, explicitly and unreservedly terminated by Davidi's father, Howard Jonas.

13

76.     By letter dated December 5, 2012, Mr. Ballabon, through counsel, responded to Davidi's November 6, 2012 letter, advising that Mr. Ballabon had already been terminated without cause on October 26, 2012.

77.     The letter further advised that, at minimum, Mr. Ballabon had been divested of his power and authority as CEO and, as a result, Mr. Ballabon was in the alternative terminating the Employment Agreement immediately for Good Reason on the basis of a diminution of his power and duties pursuant to ¶ 6 of that agreement.

78.     The letter further demanded that ICTI issue to Mr. Ballabon his full 5% equity stake and provide appropriate documentation to permit Mr. Ballabon to exercise his options.

79.     ICTI did not provide the requested documentation or offer Mr. Ballabon a mechanism by which he could exercise or otherwise effectuate his ownership of his contractually-granted equity share in ICTI.

80.     Instead, maintaining and papering the elaborate but preposterous fraud that eventually became ICTI's claims in this Arbitration, by letter dated December 11, 2012, Davidi pretended to again "terminate" Mr. Ballabon for "cause," alleging gross neglect of his job duties – job duties that Davidi had, in fact, completely taken over immediately following Mr. Ballabon's actual termination in October – and, unsurprisingly, a failure to "cure" these "deficiencies."

81.     The December 11 letter acknowledged, however, that Mr. Ballabon was entitled to certain stock options under ¶ 6(c) of the Employment Agreement, and advised that a further communication would be forthcoming "in the next few days" regarding these options.

82.     That same day, December 11, ICTI commenced an arbitration by way of a Demand for Arbitration filed with the American Arbitration Association premised on the an arbitration clause in the Employment Agreement, seeking a declaration that Mr. Ballabon was fired for cause, that ICTI's actions did not constitute a breach of the Employment Agreement, and that Mr. Ballabon was entitled to no equity in ICTI beyond the 2% already vested and for other relief  (the "Arbitration").

83.     Mr. Ballabon received no communications from ICTI regarding his stock options.

84.     Indeed, Mr. Ballabon was never provided with an opportunity to purchase or exercise stock options – neither the 2% that ICTI conceded, in its Arbitration Demand, that he was due at the outset of the Arbitration, nor the 3% that automatically vested upon Mr. Ballabon's termination without cause or resignation for good reason.

**G.      ICTI's Bad-Faith June 6, 2013 Letter.**

85.     On June 6, 2013, over six months after ICTI launched its Arbitration to evade its contractual obligations to Mr. Ballabon by claiming, in part, that it had no obligation at all to provide him with the equity to which he was entitled at the time of his dismissal, Mr. Ballabon received a letter from Davidi Jonas stating that the exercise price for options in his 2% share of equity in an unspecified company had been set at the apparently arbitrary figure of $145,200, a value claimed to have been derived from an unidentified "confidential report."

86.     The letter stated that Mr. Ballabon had 180 days to pay $145,200 or else forfeit his stock options.  ICTI refused, despite requests from Mr. Ballabon's counsel, to explain the material terms of this supposed tender of option to Mr. Ballabon.

15

87.     Explanation was required because ICTI had, in fact, never adopted a stock option plan, as required by law and under the Employment Agreement, which only ICTI was in a position to do.

88.     Nor could the strike price set by ICTI in the middle of the Arbitration correspond in any way with the Employment Agreement's very clear mandate that the strike price be based on the value of the company when it lacked any assets in May 2011.

89.     ICTI's June 6, 2013 letter was a further fraudulent device created by ICTI for the sole purpose of evading ICTI's contractual duty to compensate Mr. Ballabon.

90.     Considering all the foregoing, Mr. Ballabon contacted the Arbitrator by letter and requested that the Arbitrator rule or otherwise provide guidance or relief regarding this extraordinary conduct by ICTI in the middle of the proceedings.

91.     The Arbitrator, however, refused to take any action whatsoever.

## H.     The Tainted Arbitration

92.     The Arbitration proceedings between ICTI and Mr. Ballabon were by this time already lengthy, expensive and hotly contested and continued to be so for more than another year afterwards. But from the beginning, from the time of ICTI's strange rush to arbitration as Claimant the very same day as the fictitious second "termination for cause", the arbitration process was riddled with arbitrator misconduct.

93.     The Arbitrator's one-sided evidentiary rulings on both documentary and testimonial evidence and refusal to hear evidence pertinent and material to the controversy severely prejudiced Mr. Ballabon and were manifestly in disregard of the law and fundamental fairness so as to prevent Mr. Ballabon from presenting key evidence in a way that was at best misconduct by the Arbitrator and at worst intentional bias.

16

94.     Separate and apart from its manifest disregard of and offense to law and equity, the Arbitration Award itself is self-contradictory, irrational and illogical in its conclusions.

95.     The Arbitrator's erratic (or purposeful) behavior in declining to rule on issues or in issuing rulings orally and then retroactively changing them, virtually always to Mr. Ballabon's disadvantage, or in waiting until there was a material disadvantage to Mr. Ballabon and then retroactively ruling evidence privileged, led to Mr. Ballabon's counsel to repeatedly request that the Arbitrator issue rulings in writing or let hearings and rulings on motions be recorded or transcribed.

96.     The Arbitrator refused to do so, or to even acknowledge these requests.

97.     By so doing, the Arbitrator added considerably by way of procedural unfairness to the clear  substantive bias demonstrated by him throughout the proceedings.

I.    **ICTI's Bad Faith Conduct of the Arbitration and the Arbitrator's Evident Partiality**

98.     While ICTI takes the form of a public corporation it actually is the alter ego of an individual, Howard Jonas the controlling shareholder, and his family.

99.     ICTI (now known as STRP) hurried to commence the Arbitration at the earliest possible moment to ensure that the dispute not be litigated publicly and, as set forth herein, in an effort to engineer a binding determination that (a) Mr. Ballabon's firing actually was for cause and (b) Mr. Ballabon was not entitled to compensation.

100.    As set forth below, Jonas and ICTI failed, despite monumental effort, at (a) but, incredibly, succeeded at (b), which is in part the basis of this Petition for vacatur.

101.    In order to achieve these goals, Howard Jonas came to the Arbitration armed with witnesses on his payroll, threats of retribution against those in his employ

17

who might testify truthfully and an army of the world's most expensive litigators and private investigators.

102.    Not only was Howard Jonas in possession of all the relevant and probative documents, he oversaw or authorized a legal attack on Mr. Ballabon which, the record demonstrated definitively, included the forging of documents to facilitate ICTI's narrative on key issues; spoliation and purposeful withholding other key documents in ICTI's possession and that of IDT and other affiliated persons and entities; and extensive perjured testimony.

103.    Indeed, while the Arbitrator's findings were grossly deficient, as set forth below, they were still necessarily premised – albeit silently – on an acknowledgment by him that the vast majority of testimony given by ICTI's witnesses was patently false; that its disclosures were manifestly incomplete; and that it entered into documentary evidence documents that were obvious forgeries.

104.    ICTI proceeded in this fashion without apparent fear of consequence by the Arbitrator, however, who consistently countenanced such tactics by ICTI and allowed them to saturate the entire proceeding.

105.    Indeed, it became apparent early on during the more than two years this arbitration dragged on that the Arbitrator would take no action at any juncture to limit the chicanery and unethical conduct of the Arbitration by ICTI.

106.    Moreover, the Arbitrator consistently exercised every prerogative within his discretion to deny the most routine and non-prejudicial procedural requests made by Mr. Ballabon's legal team.

107.   Thus, for example, the Arbitrator refused to accommodate a reasonable request for a pre-hearing postponement of 30 days to allow Mr. Ballabon's new lead counsel to come up to speed in a case that by that point had already gone on for two years.

108.   ICTI, in opposing Mr. Ballabon's request, made no substantive showing of material prejudice that it might suffer if it were granted.

109.   The Arbitrator's outright denial of this request and an alternative request for at least a shorter postponement) solely on the ground that the proceedings had already gone on "long enough" served no purpose other than to disadvantage Mr. Ballabon.

110.   Most incidences of the Arbitrator's partiality were far more egregious and obvious than the seemingly minor matter of a denied request for an adjustment of the hearing schedule, as set forth below.

111.   For example, the Arbitrator consistently adopted and enforced the position of ICTI with respect to essentially every dispute involving discovery, confidentiality and privilege, no matter how transparently baseless or fraudulent.

112.   At the same time, however, the Arbitrator refused in virtually every instance to reduce the basis – or even the substance – of his decisions to writing, despite requests by Mr. Ballabon's counsel that the Arbitrator do just that.

113.   Similarly, the Arbitrator permitted ICTI an unfettered choice of witnesses for both deposition and at the hearing, while arbitrarily denying the same right to Mr. Ballabon.

114.   Significantly, late in the pre-hearing process the Arbitrator excluded as "privileged" a key financial analysis that all parties, and the Arbitrator, knew Mr.

19

Ballabon intended to use in proving damages, i.e., in proving the value of the equity wrongfully withheld from him.

115.   By deeming this key document – which it was undisputed Mr. Ballabon had, as ICTI's CEO, regular and extensive access to as part of his duties – privileged months after Mr. Ballabon's damages expert had relied heavily upon it in his report, and despite not having ruled previously that it was privileged when that claim was made by ICTI, the Arbitrator essentially eviscerated, retroactively, Mr. Ballabon's proffered expert testimony as to his primary theory of damages.

116.   Throughout the Arbitration, moreover, Mr. Ballabon brought various instances of gross misconduct of ICTI to the Arbitrator's attention.

117.   The incidents complained of to the Arbitrator included, but are not limited to, threats made against a key witness, consistent refusal by ICTI to abide by the Arbitrator's rulings, spoliation of key relevant evidence by ICTI, improper redaction of documents and an obvious failure, based on conspicuous and inexplicable gaps in ICTI's document production, to disclose key documents and other evidence.

118.   As it happens, these litigation techniques by ICTI were, as a matter of public record, identical to extreme misconduct which, contemporaneously with the arbitration, led two separate federal courts to sanction ICTI and IDT.

119.   The Arbitrator nonetheless refused to acknowledge, let alone to rule on, such misconduct, despite its profound impact on the fundamental fairness of the proceedings.

120.   A year and a half into the arbitration, and more than six months after document discovery was purportedly closed, the Arbitrator allowed ICTI  to raise, and in

virtually every instance upheld, privilege objections to powerful probative documents being offered by Mr. Ballabon.

121.    These documents, which the Arbitrator permitted ICTI to exclude from evidence well after they had been integrated into Mr. Ballabon's discovery and hearing strategy, including materials that were, for the most part, materials that that had been produced by ICTI that tended to discredit the positions taken by ICTI's witnesses and its positions in pre-hearing motion practice.

122.    Included among these documents, moreover, were an extensive set of materials which, historically, had been disclosed to, used by and relied on Mr. Ballabon – indeed, in some cases actually authored by him – in the course of his employment as CEO of ICTI.

123.    The Arbitrator's partiality with respect to the issue of privilege went so far as to turn on its head the traditional legal rule regarding the burden that is placed on a party asserting privilege, requiring Mr. Ballabon to produce to ICTI a list of any documents Mr. Ballabon might consider using for the duration of the proceedings but regarding which he anticipated ICTI might wish to claim as privileged – including documents produced by ICTI and never objected to as privileged and in a number of cases scrutinized closely enough to have been produced partially redacted.

124.    The Arbitrator made this patently biased ruling notwithstanding Mr. Ballabon's objection that this indefensible shifting of the burden concerning privilege by the Arbitrator would inevitably result in severe prejudice to him by requiring Mr. Ballabon to speculate what ICTI might conceivably argue and to provide, well in advance of the hearing, a list of documents he intended to use.

125.     As a result, ICTI was granted one-sided advance warning of the basic strategic outline of Mr. Ballabon's anticipated case in chief respecting his counterclaims and defense.

126.     Despite Mr. Ballabon's request, the Arbitrator refused to reconsider this ruling.

127.     Moreover, the Arbitrator refused to reveal the legal authority on which he relied in reaching this extraordinary ruling or to reduce it to writing, despite Mr. Ballabon's request that he do so.

128.     This refusal extended even to addressing or acknowledging this or any other key evidentiary ruling in the final Award which, pursuant to the Employment Agreement, was required to be a reasoned award.

129.     This procedural injustice merely exacerbated a situation whereby, in a series of substantive rulings, the Arbitrator granted privilege status to key evidence at the request of ICTI where none could possibly exist.

130.     The end result was that Mr. Ballabon was charged by the Arbitrator with characterizing as potentially privileged a raft of significant documents and categories of documents that could not be deemed privileged under any legal standard.

131.     This partiality by the Arbitrator saturated almost every aspect of the proceedings, most consistently with respect to refusing to consider pertinent, material and even clearly non-privileged evidence proffered by Mr. Ballabon.

132.     Another such issue arose in connection with a motion implicating the question of the damages to which Mr. Ballabon would be entitled upon a finding of

breach – a key matter that ended up going to the heart of the Arbitrator's simultaneous finding that ICTI did breach Mr. Ballabon's contract yet was not liable for damages.

133.    In that instance, ICTI submitted, in support of a motion, an entirely new argument theory of a key factual dispute based on an affidavit setting forth facts that Mr. Ballabon could readily demonstrate to be false on the basis of documents and sworn deposition testimony.

134.    The Arbitrator, however – and this time in writing – stated emphatically that he would refuse to consider Mr. Ballabon's evidence to this effect.

135.    The Arbitrator justified his refusal to consider Mr. Ballabon's evidence on the ground that it had not previously been included in Mr. Ballabon's moving papers, notwithstanding that Mr. Ballabon's submissions were meant as a response to a new argument and new "evidence" submitted by ICTI which itself was outside the scope of, and indeed inconsistent with, prior submissions.

136.    Indeed, the Arbitrator's rulings on attorney-client privilege from the discovery period through the post-trial submissions, were consistent in only one way: They consistently favored ICTI, regardless of law and policy and regardless of how inconsistent and illogical they were.

137.    These rulings were particularly unjustifiable in the Arbitration between Mr. Ballabon and ICTI where the material in question had, as mentioned above, already been revealed to Mr. Ballabon when he was CEO of the entity with which he was now engaged in litigation.  This included numerous documents shared with Mr. Ballabon before and after his employ when there could not possibly be privilege as well as those

between ICTI and Mr. Ballabon as CEO which included documents created by Mr. Ballabon himself.

138.     The Arbitrator's consistent and complete deference to every assertion of privilege by ICTI was incomprehensible considering that the arbitration process itself was confidential and was conducted pursuant to a protective order.  Thus, putting aside the question of the status of IDT – which the Arbitrator, despite repeated requests, also consistently refused to definitively resolve – there were no third parties present at the hearings.

139.     Thus it was transparently obvious that ICTI's sole concern in its assertion of privilege over virtually every document that was helpful to Mr. Ballabon's case was not with the protection of any confidence of proprietary or other independent value, but of keeping probative materials out of evidence because it helped Mr. Ballabon.

140.     The Arbitrator's partiality on this issue reached the point where the Arbitrator actually ruled that Mr. Ballabon could not even respond to ICTI's questions and arguments relating to what the ICTI claimed was privileged while permitting ICTI complete and unlimited leeway in testifying about identical issues – allowing ICTI to consistently use privilege as a sword as well as a shield.

141.     In addition to the above manipulations by the Arbitrator, the Arbitrator permitted ICTI throughout the proceedings to manipulate and shift the identity of his own party as it suited ICTI for purposes of privilege and confidentiality and discovery always to Mr. Ballabon's disadvantage and the Arbitrator refused to rule on who the Claimant actually was. This behavior by the Arbitrator also led to the exclusion of evidence that should have been permitted.

142.    The Arbitrator's abetting ICTI's ongoing shell game with ICTI's own identity grossly disadvantaged Mr. Ballabon.

143.    For example, it was discovered at the hearing, after two years of discovery and pre-hearing motions mostly relating to discovery that ICTI, which legally spun off as a separate company mid-arbitration, had withheld key documents by IDT, ICTI's parent company during Mr. Ballabon's entire tenure and through the first eight or so months of the Arbitration.

144.    This extraordinary revelation came to light only at the hearing and flatly contradicted positions taken by ICTI until that point. It had profound implications as to the integrity of the entire pre-hearing process, including privilege rulings. The Arbitrator nonetheless accepted ICTI's rationalization on this matter uncritically, despite its obviously self-serving nature and the effect of such action on Mr. Ballabon's ability to obtain legitimate discovery.

145.    Notwithstanding the position by ICTI and the Arbitrator's ruling that, for purposes of disclosure, ICTI and its previous corporate parents were separate entities, executives of IDT who held no positions with ICTI were present at all proceeding throughout the Arbitration, including depositions and the hearing, despite an explicit protective order excluded non-parties from the proceedings.

146.    This unfairness and unfettered abuse of the Arbitration process was exacerbated when ICTI produced thousands of Mr. Ballabon's personal and private documents to which its counsel gained access through unauthorized means.

147.    When challenged by Mr. Ballabon, ICTI offered three separate and conflicting narratives as to how they came to be in possession of such documents which was not only a grotesque violation of Mr. Ballabon's privacy, but potentially criminal.

148.    In response to Mr. Ballabon's appeal for relief, the Arbitrator not only tolerated the use of the Arbitration as a weapon of harassment, but allowed ICTI to make extensive use of these ill-gotten documents throughout the Arbitration and even allowed ICTI to share them with IDT,a non-party.

149.    While, after continued appeals, the invasion of privacy issue was one of the rare occasions on which the Arbitrator actually made a ruling that could have imposed some burden on ICTI to at the least prove which, if any, of its stories was true, this action was utterly vitiated by the Arbitrator's consistent refusal to enforce his rulings.

150.    Not only did this behavior by the Arbitrator prejudice the proceedings by permitting ICTI to use as evidence such ill-gotten documents, but this possibly criminal act committed as part of the arbitration was an independent cause of tremendous suffering to Mr. Ballabon abetted by the Artbitrator.

151.    The Arbitrator's repeated refusal to address this issue, despite Mr. Ballabon's repeated written requests, constituted evident partiality.

152.    Another such example of partiality was the Arbitrator's refusal to mandate that ICTI must produce Ira Greenstein, who until that point had been identified, accurately, as a board member and officer of ICTI and a senior officer of IDT, ICTI's previous parent company, for deposition – despite the fact that it had readily produced other IDT personnel such as Howard Jonas and Menachem Ash and initially had agreed to and in fact scheduled Mr. Greenstein's deposition.

26

153.    The Arbitrator then refused to allow Mr. Ballabon the alternative deponent of his choice.

154.    No such limitation was ever placed on ICTI.

155.    It stands to note that if, as ICTI claimed, officers of IDT such as Mr. Greenstein were to be treated as third parties then – as Mr. Ballabon brought to the Arbitrator's attention – ICTI was in ongoing violation of the Arbitrator's protective order since officers and employees of the parent company were granted total access to every aspect of the proceeding and attended depositions and hearings even when no officer or employee of the subsidiary and even after the subsidiary ceased to be a subsidiary and was spun off as a totally unrelated corporate entity.

156.    The Arbitrator, however, refused to rule on this issue despite multiple requests.

157.    When Mr. Greenstein's deposition was, despite the lack of support from the Arbitrator, finally arranged, his IDT-supplied attorney narrowly limited the questioning and abruptly ended the examination at a key juncture due to threats by ICTI counsel again claiming non-existent privilege.  ICTI refused all efforts to schedule a continuation of the examination and, again, the Arbitrator denied Mr. Ballabon's request to require that it be completed.

158.    The Arbitrator not only ignored but actually abetted this obvious gamesmanship just as consistently permitted ICTI to use privilege as a litigation weapon, both as sword and shield, against Mr. Ballabon in other ways.

159.    Under the fallacious rubric of privilege, Mr. Ballabon was prevented from testifying about, offering evidence concerning or questioning witnesses with reference to

the most obvious topics and facts regarding which every single person in the hearing room was already well familiar and about which the other side already had testified.

160.    This phenomenon reached its apex at the end of the hearing, after both ICTI's and Mr. Ballabon's cases had been presented, when the Arbitrator permitted ICTI to present surprise "rebuttal" testimony by ICTI's own counsel, Dov Schwell, which simply amounted to a grant to ICTI as Claimant of the opportunity to present the last testimonial word in the person of an attorney who was privy to, and who testified regarding, theretofore privileged conversations and communications.

161.    Schwell, of course, had never been named by ICTI as a potential witness, and as an attorney for ICTI was precluded from being called to give deposition or other testimony by Mr. Ballabon on the basis of ICTI's attorney-client privilege.

162.    Numerous Schwell documents had been clawed back as privileged by ICTI, and far more had never been produced in the first place.

163.    Now, however, Schwell – a lawyer intimately involved from the beginning with the litigation strategy and now familiar with the entire transcribed proceedings – was uniquely qualified, upon coaching by the ICTI litigation team, to tie up every loose end and paper over every gap in ICTI's broadly falsified presentation.

164.    Faced with this obviously improper tactic, the Arbitrator refused after over two years of proceedings to allow Mr. Ballabon any kind of adjournment of time to prepare for the attorney Schwell's testimony.

165.    Even after this, the Arbitrator refused to allow Mr. Ballabon to include, in the record, contemporaneous written evidence in the form of e-mails sent by Mr. Schwell on the precise subject matter to which he had testified and which directly contradicted

Schwell's testimony – testimony which was introduced specifically – and successfully - to create the basis on which the Arbitrator actually relied in his Award to deny Mr. Ballabon any compensation at all for the value of the equity that ICTI had stolen from him.

166.    The Arbitrator's rulings regarding Schwell's testimony were prima facie unjustifiable and manifestly biased.

167.    These rulings, together with the Arbitrator's rulings that ICTI could testify about key subject matter but that Mr. Ballabon could neither testify or present evidence as to the same subject matter, prevented Mr. Ballabon from presenting evidence that was critical to the Arbitrator's Award.

168.    Such rulings were just a few of many by the Arbitrator on privilege which gave blind deference to ICTI's assertions of attorney-client privilege no matter how specious or illogical and no matter that ICTI itself presented testimony on the very same subject matter without interference by the Arbitrator, paid short or no shrift to Mr. Ballabon's arguments, ignored his own rulings when convenient to advantage ICTI or disadvantage Mr. Ballabon, and consistently failed to reveal the legal or even logical basis on which they were based, thus excluding Mr. Ballabon's key evidence from the case.

## J.    The Award

169.    Despite ICTI's best efforts and the Arbitrator's consistent commitment to giving ICTI every benefit of the procedural doubt, it was impossible for the Arbitrator to ignore the raft of internal inconsistencies and obvious falsehoods that constituted ICTI's presentation at the Arbitration, and confronted with the documentary evidence of the October 26 firing, it was impossible for him to find that Mr. Ballabon was fired for cause

– but not for him to instead render that finding meaningless by awarding Mr. Ballabon no damages, based on tortured, internally inconsistent reasoning and a studied refusal to ignore not only extensive evidence but ICTI's own position in the Arbitration Demand itself.

170.    To at once find ICTI in breach of the Employment Agreement but still not liable for any damages, the Arbitrator first found, contrary to evidence proffered by both sides and contrary to public documents filed with the Securities and Exchange Commission included in the record, that the equity Mr. Ballabon was to receive under the Employment Agreement was in a private subsidiary of IDT, not a public company.

171.    This finding relied solely on testimony by Howard Jonas, who was not even an executive or representative of ICTI, and his lawyers, Menachem Ash and Dov Schwell, required the Arbitrator to refuse to allow all contemporaneous written evidence, which he did citing privilege,  and completely discounted the testimony of the only ICTI witness to testify on the matter, a witness who testified contrary to his own interests – former IDT and ICTI president Ira Greenstein, who had primary responsibility for recruiting Mr. Ballabon, negotiating his compensation package and who, despite ICTI's best efforts, was at no juncture whatsoever shown to have any pecuniary or other interest in testifying on Mr. Ballabon's behalf.

172.    Based on this unsupportable finding, the Arbitrator then calculated that Mr. Ballabon "would not have" purchased any theoretical options based on the testimony of ICTI's expert (whose testimony not coincidentally has been deemed "not objective" "unreliable" and "suspect" by multiple courts) that they lacked sufficient value to justify

purchase at the arbitrarily high fictitious "strike price" set by ICTI in the middle of the Arbitration.

173.    Even then, ICTI refused for months to reveal to Mr. Ballabon the basis of this "strike price," ultimately claiming to have relied on a self-serving "draft report" – a fraudulent document with figures created by ICTI itself.

174.    The Arbitrator's Award was also internally inconsistent.  Ultimately ruling that Mr. Ballabon had been terminated without cause, the Arbitrator nonetheless concluded that he had no contractual rights whatsoever in that event.

175.    How extreme, inconsistent with the evidence and illogical this position is can be deduced from the fact that not even ICTI took this position, acknowledging explicitly in repeated communications to Mr. Ballabon and even in the Arbitration Demand that Mr. Ballabon had, in fact, already owned at least 2% of the stock of ICTI pursuant to the Employment Agreement and seeking a declaration in the Arbitration only that he was not entitled to the remaining 3%.

176.    Moreover, if, as the Arbitrator ultimately ruled, the four corners of the Employment Agreement were so readily amenable to the plain meaning he ascribed to it, his refusal to so rule on the parties' motion for summary judgment raises the troubling question of what the purpose was of weeks of testimony – and tremendous cost (including the bulk of the Arbitrator's own fees) – almost exclusively dedicated to the moot question of whether Mr. Ballabon was terminated for cause.

177.    If, as the Arbitrator ruled, Mr. Ballabon was not terminated for cause, but the Employment Agreement left him with no rights whatsoever there is nothing that was

or could have been adduced at the hearing that moved the dispute forward and the matter could have been resolved on the papers.

178.    Finally, after finding that Mr. Ballabon was wrongfully terminated for cause – meaning that Mr. Ballabon actually was terminated without cause despite ICTI's assertion that it was a for cause termination – the Arbitrator then even went so far as to withhold severance pay, damages for failing to provide severance pay and damages for falsely firing Mr. Ballabon "for cause."

179.    The Arbitrator mendaciously applied the provision requiring that Mr. Ballabon sign a release in order to receive severance, which by its terms only applied in the case of a termination without cause – which ICTI itself asserted throughout the Arbitration not to be the case.

180.    This is direct self-contradiction of the applicable facts and fundamental logic is itself sufficient ground to merit vacatur of the Award.

181.    Indeed, it was undisputed that Mr. Ballabon was never given and therefore did not execute, the release which the Arbitrator ruled was an unfulfilled condition precedent to Mr. Ballabon's entitlement to the severance pay to which he was entitled under the Employment Agreement.

182.    This, in turn, raises the question of why, if ICTI saw matters that way, it bothered expending so much energy, time and resources putting forged documents and perjured testimony into evidence in its failed effort to show that Mr. Ballabon was, in fact, terminated for cause.

183.    In fact, the premise of the Award – that Mr. Ballabon was not terminated for cause – is that the extensive testimony by IDT's Menachem Ash, who it is undisputed

32

had primary responsibility for the matter, was consistently perjurious; that he manufactured or procured the preparation of such forged documents; that he oversaw the selective disclosure or non-disclosure of other documents; and that he otherwise supervised the process by which ICTI attempted, both during and before the Arbitration process, to manipulate the evidence against Mr. Ballabon or, if deemed "necessary," to simply "create" such evidence.

184.     Included in documents proven to be forged and testimony proven to be perjury was an assertion by Ash that another individual, Liore Alroy, was a board member of ICTI's during a certain period.

185.     Mr. Alroy's own testimony, also against his own interest, and all contemporaneous documents demonstrated empirically that this testimony by Ash was false.

186.     The Award nonetheless presents selected facts– including, for example, a false representation by Ash as to Mr. Alroy's membership on the ICTI board – drawn directly from ICTI submissions shown to be either established forged, false oral testimony or both.

187.     Indeed, the Arbitrator made no finding whatsoever regarding Ash's proven perjury (proven by the Award's finding that the termination was not for cause), but instead credited his testimony – and ignored that of Ira Greenstein, who testified entirely contrary to his pecuniary interest – as the basis of denying damages to Mr. Ballabon.

188.     Indeed, in order to wrongfully deny Mr. Ballabon any damages, the Arbitrator had to, and did, completely disregard the testimony of all parties to the underlying contract as to what they understood the contract to mean, including

uncontradicted testimony by both sides and both signatories that they in fact did have a meeting of the minds and what it was.

189.    Instead, the Arbitrator inserted his own reading of the contract which differed from that testified to in complete accord by both parties to the contract in order to conclude that there was no meeting of the minds concerning the equity grant – despite the Employment Agreement's explicit recitation that the equity grant was a material inducement – the "essential" inducement - to Mr. Ballabon to enter into that contract.

190.    Indeed, the Arbitrator's conclusion that there was no meeting of the minds on the fundamental matter of compensation perforce yields the result that this dispute should never have been arbitrated, considering that the contractual requirement of arbitration is found in the same Employment Agreement – an issue that was, in fact, expressly before him and on which he inexplicably declined to rule.

191.    In other words: if there was a meeting of the minds sufficient to form a contract then the Arbitrator should have awarded damages as contemplated by the Employment Agreement.

192.    The Arbitrator simply made no effort, in the Award, to explain these inconsistencies.  Nor did he, despite finding that Mr. Ballabon was terminated without cause, actually come out and acknowledge that the only way to make that finding was to acknowledge that hours and hours of contrary testimony by ICTI's witnesses was false and that key documents submitted by ICTI were fraudulent – an acknowledgment which should, absent the most profound bias, have caused the Arbitrator to consider the equities and the relationship as a whole and to render a just and realistic award in light of the facts adduced in the Arbitration.

**K.**     **New Evidence**

193.     Extraordinarily, a few weeks after the Award, ICTI made a distribution to Howard Jonas and other individuals who held equity in the private subsidiary. An executive of the company who held the exact same amount – 5% - as Mr. Ballabon's contract entitled him to, received $280,000.

194.     This distribution demonstrates that the Arbitrator's Award was not only inconsistent with law but with empirical facts.

195.     Even if the Arbitrator's baseless finding that damages were to be based on Mr. Ballabon's equity in the non-public entity were permitted to stand, and even if the Arbitrator's rejection of the plain contractual language as to strike price in favor of the fictional strike price set by ICTI during the Arbitration were upheld as far as the cost to Mr. Ballabon of the equity, the conclusion in the Award already has been patently repudiated by actual events which have demonstrated that equity in the private company does have value. Events have proven that the Arbitrator's Award was not only grossly inequitable but demonstrably wrong.

196.     The public record reveals, in fact, that ICTI and its affiliates are serial bad actors in connection with recruitment of senior executives and personnel, summary dismissal of them and attempts to avoid liability for these actions.

197.     Indeed, every such case that went to trial during this same period resulted in substantial awards to the wrongfully terminated employee.

198.     And, as noted above, ICTI and IDT have been sanctioned during this same period by at least two courts for its litigation misconduct. At best, the Arbitrator permitted the Arbitration to be shamelessly abused. At worst, he collaborated with the abuse.

199.    Furthermore, ICTI's spoliation and wrongful withholding of relevant and probative evidence; preparation, service and entry into evidence of forged documents, including records purporting to be official corporate records of ICTI; suborning of perjury and the Arbitrator's reliance on such demonstrably false submissions are so serious; and the Arbitrator's refusal to grapple with this conduct, or even explicitly to acknowledge it, is so deficient that the only chance for a proper investigation, which justice as well as the Court's obligation to supervise the conduct of attorneys demand, is by vacatur of the Award and a trial and related proceedings de novo in this Court.

200.    Finally, as alleged above, the Arbitrator demonstrated partiality; failed to conduct an arbitration with even basic procedural fairness; denied reasonable requests for extensions; refused to enforce and even to record key rulings; refused to hear or allow the submission of admissible evidence pertinent and material to the controversy; manifestly disregarded the facts and the law; issued an Arbitration Award that does not draw its essence from the agreement between the parties or the applicable law; is amenable to and should be vacated on the basis of new evidence; otherwise engaged in gross misconduct by which the rights of Mr. Ballabon were prejudiced; and that new evidence has become known and will become known such as is sufficient under the law to justify vacatur.

WHEREFORE, petitioner respectfully requests that pursuant to the provisions of the statute in such cases made and provided, a judgment be entered herein, vacating and setting aside the Award of the Arbitrator, and awarding petitioner the costs and disbursements of this proceeding, together with such other relief as to the Court may seem just and proper.

36

**ARCHER & GREINER**
A Professional Corporation

By: _____
      Ronald D. Coleman

Michael S. Horn
44 Wall Street – Suite 1285
New York, NY  10005
(212) 292-4998
Attorneys for Petitioner
Jeffrey Ballabon

Dated:  May 27, 2015

37

VERIFICATION
STATE OF NEW YORK
COUNTY OF NASSAU: ss:

Jeffrey Ballabon, duly affirming, deposes and says that: I am the petitioner in this proceeding; I have read the foregoing petition and know the contents thereof; the same are true to my own knowledge, except as to matters therein stated to be alleged on information and belief; and as to those matters I believe them to be true.

Affirmed to before me this
27th day of MAY , 20 15

Petitioner

_____
Jeffrey Ballabon

_____
Notary Public

BARBARA A. BURKE
Notary Public, State of New York
No. 01BU6298126
Qualified in Nassau County
Commission Expires March 10, 2018

**SUPREME COURT OF THE CITY OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| *In the Matter of the Application of*<br> JEFFREY BALLABON,<br><br>     *Petitioner*,<br><br><br>*For an Order and Judgment Pursuant to*<br>*CPLR Article 75*<br><br>     —*against*—<br><br>STRAIGHT PATH IP GROUP, INC. f/k/a<br>INNOVATIVE COMMUNICATIONS<br>TECHNOLOGIES, INC.,<br><br>     *Respondent*. | Index No.<br><br><br><br>**NOTICE OF PETITION** |

---

     PLEASE TAKE NOTICE that upon the Verified Petition of Jeffrey Ballabon, affirmed to on May 27, 2015, and the confidential documents incorporated by reference thereto, petitioner will, at 9:30 AM on the 27th day of August, 2015 at the Courthouse at 60 Centre Street, New York, New York in the Motion Submission Part Courtroom, Room 130, request that this Court issue a judgment, pursuant to the Civil Practice Law and Rules (CPLR), vacating and setting aside the Award of the Arbitrator rendered in the arbitration between Petitioner and Respondent and awarding Petitioner the costs and disbursements of this proceeding, together with such other relief as to the Court may seem just and proper.

                          **ARCHER & GREINER**
                          A Professional Corporation

                          By: _____
                                Ronald D. Coleman

                          Michael S. Horn
                          44 Wall Street – Suite 1285
                          New York, NY  10005
                          (212) 292-4998
                          Attorneys for Petitioner
                          Jeffrey Ballabon

Dated:  May 27, 2015

FILED: NEW YORK COUNTY CLERK 05/27/2015 02:42 PM
NYSCEF DOC. NO. Case 1:15-cv-05016-DLC Document 1-1 Filed 06/26/15 Page 42 of 47 NYSCEF: 05/27/2015

INDEX NO. 651842/2015

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840 (7/2012)

| | | For Court Clerk Use Only: |
|---|---|---|

**Supreme** _____ COURT, COUNTY OF _____ **New York**

| | IAS Entry Date |
|---|---|

**Index No:** _____  **Date Index Issued:** _____

| | Judge Assigned |
|---|---|

**CAPTION:**  Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

| | RJI Date |
|---|---|

In the matter of the Application of

JEFFREY BALLABON, Petitioner,

for an Order and Judgment Pursuant to CPLR Article 75

**Plaintiff(s)/Petitioner(s)**

-against-

STRAIGHT PATH IP GROUP, INC. f/k/a INNOVATIVE COMMUNICATIONS TECHNOLOGIES, INC.,

**Defendant(s)/Respondent(s)**

## NATURE OF ACTION OR PROCEEDING:     Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested
  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum.** For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____
  (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability: _____
  (specify)
- ○ Other Negligence: _____
  (specify)
- ○ Other Professional Malpractice: _____
  (specify)
- ○ Other Tort: _____
  (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see NOTE under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other: _____
  (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ○ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ○ Other Commercial: _____
  (specify)
  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum.**

**REAL PROPERTY:**  How many properties does the application include? ____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):     ○ Residential    ○ Commercial
Property Address: _____
  Street Address          City          State          Zip
  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum.**
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property: _____
  (specify)

**SPECIAL PROCEEDINGS**
- ◉ CPLR Article 75 (Arbitration)   [see NOTE under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene: _____
  (specify)
- ○ Other Special Proceeding: _____
  (specify)

## STATUS OF ACTION OR PROCEEDING:     Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: _____ |
| Has a summons and complaint or summons w/notice been served? | ○ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION:**     Check ONE box only AND enter additional information where indicated

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice     Date Issue Joined: _____
- ○ Notice of Motion     Relief Sought: _____     Return Date: _____
- ● Notice of Petition     Relief Sought: Vacate - Decision/Order/Judgment/Award     Return Date: 08/27/2015
- ○ Order to Show Cause     Relief Sought: _____     Return Date: _____
- ○ Other Ex Parte Application     Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

**RELATED CASES:**     List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| None | | | | |
| | | | | |
| | | | | |

**PARTIES:**     For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | Ballabon (Last Name) / Jeffrey (First Name) Primary Role: Petitioner / Secondary Role (if any): | Horn (Last Name) Michael (First Name) / Archer & Greiner, P.C. (Firm Name) / 44 Wall Street, Suite 1285 (Street Address) New York (City) New York (State) 10005 (Zip) / Phone Fax e-mail | ○ YES ○ NO | |
| ☐ | Straight Path IP Group, Inc. f/k/a Innovative Communications Technologies (Last Name / First Name) Primary Role: Respondent / Secondary Role (if any): | Laffey (Last Name) Casey (First Name) / Reed Smith LLP (Firm Name) / 599 Lexington Avenue, 30th Floor (Street Address) New York (City) New York (State) 10022 (Zip) / Phone Fax e-mail | ○ YES ● NO | |
| ☐ | (Last Name / First Name) Primary Role: / Secondary Role (if any): | (Last Name) (First Name) / (Firm Name) / (Street Address) (City) (State) (Zip) / Phone Fax e-mail | ○ YES ○ NO | |
| ☐ | (Last Name / First Name) Primary Role: / Secondary Role (if any): | (Last Name) (First Name) / (Firm Name) / (Street Address) (City) (State) (Zip) / Phone Fax e-mail | ○ YES ○ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.**

Dated: 05/27/2015

4409231
**ATTORNEY REGISTRATION NUMBER**

SIGNATURE
Michael S. Horn
**PRINT OR TYPE NAME**

[Print Form]

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF  New York
_____x

JEFFREY BALLABON,

                                        Plaintiff(s)/Petitioner(s)
-against-

STRAIGHT PATH IP GROUP, INC., etc.

                                        Defendant(s)/Respondent(s)
_____x

UCS-840C
3/2011

Index No. _____

RJI No. (if any) _____

**COMMERCIAL DIVISION**
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☐ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions — without consideration of the monetary threshold

☐ Commercial class actions — without consideration of the monetary threshold

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold

☒ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ 3,500,000.00

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

Vacatur of commercial arbitration award arising from executive termination and stock option agreement.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated:  05/27/2015

                                        _____
                                                SIGNATURE

                                        Michael S. Horn
                                        _____
                                                PRINT OR TYPE NAME

NEW YORK: IN THE SUPREME COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK
JEFFREY BALLABON, PETITIONER

VS                              CASE NO.

STRAIGHT PATH IP GROUP, INC. f/k/a
INNOVATIVE COMMUNICATIONS TECHNOLOGIES, INC.

<u>AFFIDAVIT OF SERVICE</u>

1. I, <u>Jody L. Ashworth</u>, am at least 18 years of age, competent to testify, and not a party to this action, and not otherwise interested in the subject matter in controversy in this action.

2. On the <u>27TH</u> day of <u>May</u> , 2015 , <u>3:49</u>  pm, I served  <u>STRAIGTH PATH IP GROUP, INC. f/k/a INNOVATIVE COMMUNICATIONS TECHNOLOGIES, INC.</u> by

   (     ) Personal Service by delivering a copy thereof in writing to the party in person.

   (     ) Substitute Service at usual Place of Business or Employment by delivering and leaving with the person apparently in charge thereof during business hours after giving information of its purport.
   Name and title: _____.

   (XXX) Corporate Service by delivering and leaving with <u>YONATAN CANTOR</u>, who is <u>VICE PRESIDENT OF FINANCIAL OPERATIONS</u> of the above entity/person being served.

   Documents Served: NOTICE OF PETITION, VERIFIED PETITION TO VACATE ARBITRATION AWARD, NOTICE OF COMMENCEMENT OF ACTION SUBJECT TO MANDATORY ELECTRONIC FILING, REQUEST FOR JUDICIAL INTERVENTION, COMMERCIAL ADDENDUM

   At <u>5300 HICKORY PARK DRIVE, STE 218, GLEN ALLEN, VA,</u>.

3. I solemnly affirm under penalties of perjury that the contents of the foregoing affidavit are true to the best of my knowledge, information, and belief.

Additional Comments: MR. CANTOR IS A WHITE MALE
APPROX 24 YEARS OF AGE, 5'9", 150 LBS, BROWN HAIR

SERVOR, INC.

Process Server
3420 PUMP ROAD #114
HENRICO, VIRGINIA 23233
(804)285-0959

COMMONWEALTH OF VIRGINIA,
COUNTY OF HENRICO;
Subscribed and Sworn before me this <u>27TH</u> day of <u>May</u> 2015
By <u>Jody L. Ashworth</u>
My Commission Expires <u>May 31, 2016</u>

Notary Public

Sheri M. Perkinson
Commonwealth of Virginia
Notary Public
Commission No. 146897
My Commission Expires 5/31/2016

**SUPREME COURT OF NEW YORK**
**COUNTY OF NEW YORK**

Index No. 651842/2015

*In the Matter of the Application of*

JEFFREY BALLABON,

*Petitioner,*

*For an Order and Judgment Pursuant to CPLR Article 75,*

*-against-*

STRAIGHT PATH IP GROUP, INC. f/k/a
INNOVATIVE COMMUNICATIONS
TECHNOLOGIES, INC.,

*Respondent.*

**AFFIRMATION OF SERVICE**

1.      I, Ronald D. Coleman, am at least 18 years of age, competent to testify, and not a party to this action, and not otherwise interested in the subject matter in controversy in this action.

2.      On the 27th day of May, 2015, I served the Notice of Petition, Verified Petition to Vacate Arbitration Award, Notice of Commencement of Action Subject to Mandatory Electronic Filing, Request for Judicial Intervention and Commercial Addendum on Straight Path IP Group, Inc. f/k/a Innovative Communications Technologies, Inc. by:  Corporate Service by delivering and leaving with Davidi Jonas, who is the Chief Operating Officer of the above entity being served.

3.      I solemnly affirm under penalties of perjury that the contents of the foregoing Affirmation are true to the best of my knowledge, information and belief.

Additional Comments: Davidi Jonas is known to me from our past involvement in the arbitration hearings in this matter.  He is of medium-to-tall height with brown hair and slender build.  At time of service he had a growth of beard of perhaps a month.

Ronald D. Coleman

Affirmed and subscribed to before me
this *8th* day of June, 2015:

**CHRISTINE KESNIG**
**A Notary Public of New Jersey**
**My Commission Expires Nov. 20, 2017**

12679430v1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** New York
-----------------------------------------------------------------x

Jeffrey Ballabon,

                    Plaintiff/Petitioner,

        - against -                                    Index No. _____

Straight Path IP Group, Inc., f/k/a Innovative ...

                    Defendant/Respondent.
-----------------------------------------------------------------x

## NOTICE OF COMMENCEMENT OF ACTION
## SUBJECT TO MANDATORY ELECTRONIC FILING

        PLEASE TAKE NOTICE that the matter captioned above, which has been commenced by the filing of the accompanying documents with the County Clerk via the   New York State Courts Electronic Filing System ("NYSCEF"), is subject to mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial Courts. This notice is being served as required by Subdivision (b) (3) of that Section.

        Counsel and/or parties **must either**: 1) immediately record their representation within the e-filed matter on the Consent/Represent page in NYSCEF; or 2) file the Notice of Opt-Out form to claim one of the limited exemptions from mandatory e-filing (see below). Failure to record representation may result in an inability to receive electronic notice of any document filings. Claiming an exemption will require the exempt party to serve and be served with hard copy documents.

        Counsel and unrepresented parties who intend to participate  in e-filing must first create a NYSCEF account and obtain a user ID and password. For additional information about electronic filing, and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov; mailing address: 60 Centre Street, New York, New York 10007).

        Exemptions from mandatory e-filing (Section 202.5-bb(e)) are limited to:

            1) attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the operational knowledge to comply with e-filing requirements; and

            2) parties who expect to represent themselves and who choose not to participate in e-filing. (Such parties are encouraged to visit www.nycourthelp.gov or contact the Help Center in the court where the action is pending.)

Dated: 5/27/2015

_____ (Signature)          44 Wall Street, Suite1285 _____ (Address)

Michael S. Horn, Esq. _____ (Name)          New York, NY  10005

Archer & Greiner, P.C. _____ (Firm Name)          212-292-4998 _____ (Phone)

To:    Straight Path IP Gro          mhorn@archerlaw.com _____ (E-Mail)

        Hickory Park Dr.

        Glen Allen, VA                                              3/30/15