**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of the Application of<br>JEFFREY BALLABON,<br><br>Petitioner,<br><br>—against—<br><br>STRAIGHT PATH IP GROUP, INC. f/k/a<br>INNOVATIVE COMMUNICATIONS<br>TECHNOLOGIES, INC.,<br><br>Respondent. | 15cv5016 (DLC)<br><br><br>**DECLARATION OF RONALD D.<br>COLEMAN IN SUPPORT OF<br>PETITION OF JEFFREY BALLABON<br>TO VACATE ARBITRATION AWARD** |

RONALD D. COLEMAN, under penalty of perjury, declares and says as follows:

1.      I am a member of the Bar of this Court and a partner in the firm of Archer & Greiner, P.C., counsel for Petitioner Jeffrey Ballabon.

2.      I submit this Declaration for purposes of authenticating documents which I know, based on firsthand knowledge or upon information and belief, to be true and correct copies of the documents they purport to be and which are referred to in Reply Memorandum of Law filed by Petitioner in support of his Verified Petition.

3.      Attached hereto as Exhibit A is a true and correct copy of the Award rendered by the arbitrator in the arbitration that is the subject of the Verified Petition.

4.      Attached hereto as Exhibits B through H is correspondence in this matter from counsel for petitioner to the arbitrator.

5.      Attached hereto as Exhibit I is Petitioner's Post-Hearing Brief in the

arbitration (in which he was designated "Respondent").

Dated:  October 16, 2015
New York, New York

_____

Ronald D. Coleman

EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT DISPUTES PANEL
-------------------------------------------------------------X

STRAIGHT PATH IP GROUP, INC.
 f/k/a INNOVATIVE COMMUNICATIONS
 TECHNOLOGIES, INC.,

                           Claimant,

            -against-

JEFFREY BALLABON,

                     Respondent.
-------------------------------------------------------------X

Case No. 13 166 02650 12

## FINAL AWARD

       This matter comes before me by means of a demand for arbitration dated
December 11, 2012 (the "Demand") submitted by Claimant Straight Path IP Group, Inc.
f/k/a Innovative Communications Technologies, Inc. ("Claimant" or "ICTI") seeking
various declaratory relief.  Specifically, Claimant seeks declarations that its termination
of the employment of Respondent Jeffrey Ballabon ("Ballabon" or "Respondent") was
properly made for cause, as defined in the operative May 17, 2011, employment
agreement between the parties (the "Employment Agreement"), and that Ballabon is not
entitled to compensation or benefits beyond the base salary, which he received, through
the date of his termination.

       Respondent filed an Answering Statement with Counterclaims generally denying
the allegations in the Demand and raising several counterclaims seeking declaratory
relief and contract damages.  In particular, Respondent is seeking declarations that (1)
Ballabon was terminated without Cause (or otherwise resigned with Good Reason), as
defined in the Employment Agreement; (2) upon termination of his employment,
Ballabon's unvested incentive stock options accelerated and vested; and (3) ICTI
breached the Employment Agreement by failing, among other things, to issue Ballabon
his fully vested stock options and to pay him severance pay due him under the
Employment Agreement.  Ballabon further seeks, as denoted in his Specification of

Damages, the "monetary value of a sum equivalent to his 5% interest in the monetization of the patent assets of ICTI." Claimant denied the majority of Respondent's factual allegations, asserted that the Employment Agreement is an integrated, written agreement that precludes some or all of Respondent's counterclaims, and raised multiple affirmative defenses to Respondent's counterclaims.

The hearing in this matter was held on November 3-7 and 20, 2014. Based on the testimony and documentary evidence presented at the hearing, including expert testimony, a full review of the record in this case, the post-hearing memoranda submitted by the parties, and applicable case law, I find, for the reasons offered below, that both ICTI's claims and Respondent's counterclaims are granted in part and dismissed in part. As a result of these findings, I conclude that Respondent is not entitled to any further compensation in the form of severance or otherwise and does not have any remaining equity interests in Claimant or any related entity.

**Procedural Background**

The parties engaged in substantial discovery in this highly contentious matter, including depositions. Various motions were filed, for example addressing privilege issues, and resolved. Expert witnesses were retained and produced reports and testified at the hearing.

The parties requested the opportunity to file and did file cross-summary judgment motions. Both motions were denied.

## RELEVANT FACTUAL BACKGROUND

**The Parties**

Ballabon is a Yale-educated attorney who, prior to joining ICTI, among other positions, served as: Vice President of Court TV: an executive at Channel One; the head of his own lobbying and communications firm, and; Senior Vice President of CBS News. Ballabon left CBS in or around January 2011 and soon after began interviewing for the position of Chief Executive Officer of ICTI, a non-public subsidiary of IDT Corporation ("IDT"). Howard Jonas is the CEO of IDT.

ICTI was formed by IDT in March 2011 as a special-purpose, non-practicing entity for the express purpose of "owning and licensing IP assets" that IDT had resolved to transfer into ICTI from one of its other subsidiaries. Menachem Ash, Esq., among

2

other positions with IDT, served as legal counsel to ICTI.  Ira Greenstein ("Greenstein"), an IDT executive and a long-time confidante of and legal counsel to Howard Jonas, introduced Ballabon to Mr. Jonas and signed the Employment Agreement as ICTI's President.

The ICTI Board for most of Ballabon's tenure consisted of Mr. Ash, who owned .05% of ICTI stock and Mr. Liore Alroy, who owned 5% of Claimant's stock.

**Relevant Terms of Employment Agreement**

The Employment Agreement between the parties was executed on or about May 17, 2011 after approximately two months of negotiation.  Both sides were represented by counsel.

The Employment Agreement was for a four year period.  Ballabon was paid $250,000 a year and was eligible for discretionary bonuses.   In the Employment Agreement, Ballabon committed to "devote such of his professional time and attention to the performance of his duties to the Company as is, in the reasonable judgment of the Board, necessary to the fulfillment of his duties."  Ballabon was permitted to conduct other business and activities as long as those activities did not interfere, in the Board's reasonable judgment, with the performance of his duties and provided that Ballabon sought and received the Board's prior approval.

The Employment Agreement could be terminated for no cause, cause, or for good reason.  Cause was defined to include "gross negligence" and "willful or continued failure to perform his duties."  In the latter case, written notice specifying the alleged failures and a 30 day opportunity to cure was required.  Termination for good reason is defined to include a material diminution of Ballabon's duties or a material breach not cured within 15 days after notice is provided.  Upon termination without cause or for good reason, Ballabon would be entitled to severance equal to one-half of the salary that would be owed to him from the date of his termination until the end of the four year term, with a one year minimum.   As a condition to receipt of such severance, Respondent was required "to execute and deliver to the Company a general release in form and substance satisfactory to the Company no later than five (5) days following such Date of Termination."

The Employment Agreement was a fully integrated contract that included a merger clause and a no oral modification provision.  Specifically, the Employment Agreement provided that it "is intended to be the final, complete, and exclusive statement of the terms of Executive's Employment by the Company and may not be contradicted by evidence of any prior or contemporaneous statements or agreements, except for agreements specifically referenced herein."  Ballabon also affirmatively represented and warranted that he relied upon the advice of independent counsel "and not upon any representation (legal or otherwise), statement or advice said or offered by the Company or the Company's counsel in connection" with the Employment Agreement.  The parties also acknowledged that the document "supersedes all prior and contemporaneous statements or agreements" between the parties.

The Employment Agreement also provided for the arbitration of any dispute.  The Employment Agreement stipulates that the arbitrator is without "authority to amend or modify any of the terms of this Agreement."

**Equity Grant and Stock Option Terms**

The Employment Agreement, at paragraph 6(c), also established that Ballabon would be entitled to purchase stock in ICTI.  Ballabon was originally offered restricted stock units but opted for stock options instead, on the advice of counsel, for tax purposes. (Joint Exhibit ("Jt. Exh.") 26).  The Employment Agreement expressly recognized that "equity participation in the Company through the grant of options to purchase equity of the Company is essential to induce [Ballabon] to agree to provide the services contemplated by this Agreement."  ICTI was obligated within 15 days of the date of the Employment Agreement to "grant [Ballabon] incentive stock options to purchase shares of [ICTI's] common stock in an amount equal to five percent (5%) of [ICTI's] total outstanding equity capitalization on the date thereof (the "Ballabon Shares") on the terms set forth in the Equity Instruments."  The stock options were to be issued "pursuant to the terms and conditions of a duly authorized stock option plan (in the form annexed hereto and to be duly adopted by the Company and ratified by its stockholders) and related option agreement the form annexed hereto . . .."

The Employment Agreement required that the options immediately vest upon "termination hereof by [ICTI] without Cause or resignation by [Ballabon] for Good

4

Reason; provided, further that all vested options will be cancelled in the event the Employment is terminated for Cause or if [Ballabon] resigns without Good Reason, as set forth herein."

The Employment Agreement established the exercise price per share to "be equal to the fair market value of the Ballabon Shares on the date of the grant" in accordance with "Equity Instruments", which are defined as the stock option plan and stock option agreement.

ICTI sent Ballabon the execution copy of the Employment Agreement on May 17, 2011. Ballabon was also provided with copies of the proposed Equity Instruments – an ICTI 2011 Stock Option Plan and an Incentive Stock Option Agreement. Although drafts of these documents were subsequently exchanged between counsel, no agreement was reached between ICTI and Ballabon on such essential terms as the strike price of the options, the duration and expiration of the options, any conditions on exercisability, transferability of the options, tax specifications, and the mechanism for exercising the options.

**Parties' Understanding of Equity to Which Ballabon was Entitled**

The parties agree that the Equity Instruments were not finalized. Nonetheless, Ballabon contends, and Greenstein concurs, that the parties understood that Respondent was to be granted 5% equity in ICTI. The options, as Ballabon understood it, were to be available to him, not at a fair market value as the Employment Agreement expressly provided, but rather at a nominal or zero value. As he testified, "But the term was 5 percent, four years, and to me, right, there wouldn't be a cost to actually acquiring the options. They would gross me up or give me – by giving me a bonus." (Hearing Transcript page ("Tr.") 1626). In any event, Ballabon contends that setting the fair market value was the province of Respondent and any failure to do so should not serve to deny him his equity interest in ICTI. Moreover, Ballabon insists that the 5% was intended to be in ICTI after it was spun off as a public company, not as a private company.

Greenstein, who signed the Employment Agreement on behalf of ICTI, agreed that there was an understanding that Ballabon would get 5% of ICTI, notwithstanding what the Employment Agreement stated. He reasoned that stock options are

appropriate for a public company, which ICTI did not become during Ballabon's tenure. Greenstein explained that the equity was structured in a way to benefit ICTI and attributes the delay to finalizing the Equity Instruments to internal issues at ICTI.

**Valuations of ICTI**

On two occasions, for reasons unrelated to Ballabon's employment, ICTI commissioned valuations from independent valuation firms, Charles River Associates and Corporate Valuation Associates. The principal reason for the valuations was to calculate the fair market value of ICTI at various points in time. Charles River Associates issued its report as of April 1, 2011 and estimated the fair market value of ICTI to be $7.5 million to $12.4 million. Corporate Valuation Advisors valued the fair market value of ICTI to be $6.6 million as of December 31, 2012.

**Plan to Spin Off ICTI**

Prior to Ballabon's employment IDT had initiated a litigation to enforce its patent rights. A counter-suit was filed which proved very costly and detrimental to IDT's position and the case settled unfavorably to IDT. Reacting to this counter-assertion risk, IDT concluded that the best way to minimize the risk of future counter-assertion suits was to spin off ICTI. In order to successfully spin-off ICTI, it was essential that it have a CEO in place before it went public. For this reason, there was great urgency in recruiting a CEO, the position to which Ballabon was hired. In turn, the fact that IDT intended to spin-off ICTI and to take it public was a significant motivation for Ballabon to accept the position.

Despite this goal of going public, the Employment Agreement does not make the spin-off a condition of employment or an ICTI obligation. In this regard, the Agreement states that Ballabon would receive equity in ICTI which, at the time the Employment Agreement was executed, was as a non-public subsidiary of IDT.

It is undisputed that in March 2011, IDT filed a SEC Form 10 publicly disclosing its plan to spin off ICTI, subject to final IDT Board of Directors review and approval. The IDT Board appointed a special subcommittee of its independent directors to report on this issue and retained the law firm of Willkie Farr & Gallagher to advise IDT.

**Decision Not to Spin Off ICTI**

At a Board meeting on June 20, 2011, after Respondent began his employment, the IDT Board voted unanimously not to spin-off ICTI based on the recommendation of the special subcommittee.

Howard Jonas met with Respondent soon after the decision was made not to spin-off ICTI and offered Ballabon the chance to pursue other opportunities within IDT or to be released from his obligations under the Employment Agreement.  Mr. Jonas testified that he told Respondent that he was "not going to hold you to your contract. Like, you know, if you want, you can leave – I probably offered him a few months' severance, you know, so he would have time to find another job." (Tr. 111).  Ballabon elected to remain CEO of ICTI as a subsidiary of IDT even after its planned spin-off was canceled.[1]

**Ballabon's Performance**

The parties dispute the effort that Ballabon put into the job of CEO of ICTI and his degree of success.

ICTI argues that, as Howard Jonas put it, Ballabon "did nothing. He didn't go to work.  He barely spoke to the lawyers.  He let the lawyers do everything. . .  Because he was lazy." (Tr. 132, 134).  Claimant contends that Ballabon did not file a single new litigation during his tenure, did not obtain any new licenses, failed to hire additional law firms to assist in monetizing the patents, did not actively pursue alternative approaches to monetizing its patents, and did not earn a single dollar of profit for it during his entire tenure.

In contrast, Respondent testified about the many activities that he performed on behalf of ICTI, in particular, in furtherance of his efforts to monetize the patents.  He also points to a number of barriers to his efforts to monetize ICTI's patents, including the fact that to minimize the counter-assertion risk he needed to keep his distance from IDT and the resources it could provide.  His efforts to litigate on behalf of ICTI were hindered by the renegotiation of the agreement with Claimant's law firm, Kirkland & Ellis, which continued for most of 2011.  Despite this interruption, the Kirkland & Ellis partner assigned to the ICTI account, David Callahan, Esq., testified that he was in "pretty

---

[1] Ballabon is not asserting a claim against ICTI based on any alleged breach of the Employment Agreement in 2011.

frequent" contact with Ballabon and had "regular touch points" with him. (Tr. 1259).  Mr. Callahan did not notice any material difference in his relationship with Respondent just prior to his termination as CEO of ICTI.  Greenstein also spoke well of Ballabon's performance.

Respondent also points out that the record is devoid of any written criticism of his performance until the months just prior to his termination

## Ballabon's Outside Activities

Ballabon, during his tenure, was very engaged in outside activities, including activities related to the 2012 presidential election on behalf of various Republican causes.  It is clear that he did not formally submit requests to the ICTI Board for permission to engage in these activities as contemplated by the Employment Agreement.  It is also clear that many of his activities were known to Howard Jonas and other leaders of IDT.  Indeed, Howard Jonas encouraged some and participated in others.  For example, Ballabon invited Mr. Jonas to have lunch with Governor Rick Perry which he accepted and asked if his daughter could join. (Respondent ("Resp.") Exh. 49). The same was true for an invitation to attend the National Religious Broadcasters Convention. (Resp. Exh. 60).  Howard Jonas also asked Ballabon to perform other activities on behalf of IDT, which Respondent did without additional recompense.

Nonetheless, Ballabon's outside activities became a bone of contention between the parties and became one of the grounds for Ballabon's termination.  For example, on August 6, 2012, Howard Jonas sent an email to Ballabon stating, among other things, that he did not "think things are working out between you and IDT."  In doing so, Mr. Jonas referenced Ballabon spending "much of your working time on Twitter and the like" and the "lack of progress and effort" in monetizing the ICTI patent portfolio.  Mr. Jonas recommended that they "sit down to work out something amicably without having to get into the issue of cause." (Jt. Exh. 44).

## Davidi Jonas Joins ICTI

Howard Jonas hired his son, Davidi Jonas, to work with Respondent at ICTI. Davidi Jonas had performed some work for other IDT entities starting in June 2012 with some success.  Howard Jonas hoped that his son could work with Ballabon "who was

sort of unresponsive and not with the program" and help "get him communicating with me and maybe get, you know, some fire going . . ." (Tr. 173). Ballabon viewed it, correctly as it turns out, as evidence that he was a "a dead man walking" and as a prelude to his termination. Ballabon's resentment was borne of his view that Davidi Jonas was not qualified to replace him.

The record supports the view expressed by Claimant's witnesses that, despite Davidi Jonas's relative lack of experience, his efforts on behalf of Claimant were successful following Ballabon's termination as evidenced by the fact that Straight Path Communications, Inc, and its two operating units, Straight Path Spectrum[2] and Straight Path IP Group, Inc., f/k/a/ ICTI, were spun off in July 2013.

## Decision to Terminate Ballabon's Employment

On October 26, 2012, Howard Jonas met with Ballabon and informed him that he was being terminated for cause. Mr. Jonas testified that he told Ballabon that "I'm willing to pay you, I'm willing to payout your salary [and] . . . pay you all four years' salary and I'm willing to give you like half of the equity that you would have earned, even though it's only like 18 months . . . I'm willing to give you like two years' equity." (Tr. 177). Respondent interpreted this proposal as encompassing both his vested and unvested options (the latter of which under the terms of the Employment Agreement would have been forfeited in the event of a cause termination) and responded with a proposal that same day with three separate options, including an offer to surrender his 5% interest in ICTI in exchange for $6.5 million and a 90 day call option to purchase ICTI and its patents. Claimant rejected each of Ballabon's proposals. Howard Jonas also suggested that IDT might establish a Spanish language conservative news network and raised the possibility that Ballabon could serve as its CEO and that Ballabon might serve on ICTI's Board. According to Ballabon, Howard Jonas stated "we have to pay you anyway, so we might as well get some work." (Tr. 1499). No position was in fact offered to Ballabon following notice of his termination.

Mr. Jonas forwarded an email to Ballabon officially notifying him that "[a]s per the termination clause in your contract . . . [p]lease be informed that I am terminating you for

---

[2] Straight Path Spectrum maintains a valuable portfolio of wireless spectrum assets and is unrelated to Claimant's business other than sharing the same parent.

9

cause immediately.  David Jonas will take over all your responsibilities and will be in charge of dealing with all the law firms. This termination is for cause as you've done little work and added little value (little is very generous) to ICTI." Ballabon testified that he was certain that he had in fact been terminated.  He explained that Howard Jonas "has absolute and total power of an absolute monarch and dictator in that company. There is nothing he can't do, there is nothing beyond his power, and when he says it, it's done." (Tr. 1498).  Ballabon's view was supported by Howard Jonas's actions immediately after notifying Respondent of his termination, which included forwarding all of Ballabon's business emails to Davidi Jonas and making arrangement to turn off his work phone and email. (Jt. Exh. 46).

Apparently recognizing that Howard Jonas's notice did not fully comply with the requirement for a cause termination under the Employment Agreement, Claimant sent Ballabon a letter from Davidi Jonas[3], dated November 6, 2012, detailing Ballabon's alleged failures to adequately discharge his job duties and providing him with an opportunity to cure such deficiencies within a thirty-day period.  Ballabon did not respond to the November 6th letter as he had concluded that he had already been terminated.  When asked why he did not try to comply with the mandates of the November 6th letter, Ballabon testified "Unless there would be some way to become Howard Jonas' son, there would be no way to reinstate my employment." (Tr. 1326). He also postulated that a principal motive for attempting to satisfy the conditions in the Employment Agreement for a cause termination was to ensure that IDT would recoup Ballabon's equity in ICTI.

Davidi Jonas sent another letter to Ballabon, dated December 11, 2012, which notified Ballabon that he had been terminated for cause.

## Entitlement to Severance Upon Termination

The Employment Agreement provides that in the event Ballabon's employment was terminated without cause ICTI would pay him severance equal to one-half of his salary for the period remaining until expiration of the four year term, with a minimum of one year payable in conformity with ICTI's payroll policies.  A condition of receipt of severance pay was that Ballabon "execute and deliver to [ICTI] a general

---

[3] Davidi Jonas was made Vice President of ICTI by Board Unanimous Consent on November 2, 2012.

release in form and substance satisfactory to [ICTI] no later than five (5) days following such Date of Termination."

Ballabon admitted that he did not provide ICTI with a general release at the time of his termination or at any point thereafter. Moreover, Respondent testified that he was not prepared or willing to do so if he would not be permitted to pursue his claim for equity.

## Ballabon's Election Not to Purchase Options

On December 5, 2012 Ballabon's counsel notified Claimant that he viewed his termination as being without cause and, in any event, was resigning for good reason. Respondent's counsel notified Claimant that Ballabon was exercising his stock options to the extent that a stock option plan was in place and inquired as to the strike price of those options. Claimant responded in a letter dated June 6, 2013 informing Ballabon that the price for his 20 vested shares was $145,200 based on the Charles River Associates valuation of ICTI when Respondent joined in May 2011. The letter noted that the options would terminate effective December 6, 2013. Respondent's right to exercise his options was without prejudice to any other rights or claims he had, including those raised in this arbitration.

Respondent's counsel wrote a letter to me on December 6, 2013, asking that I rule that no payment would be required with respect to the options and that Ballabon's failure to tender payment would be without prejudice. In an Order dated December 23, 2013, I declined to "rule" on the basis of a letter forwarded on the day payment for the options was due. The record does not indicate any other efforts by Respondent or his counsel to address the payment of the options issue during the six month period after Claimant issued its June 6, 2013 letter.

## DISCUSSION

Central to the dispute between the parties here is the interpretation of the Employment Agreement. Both sides ask me to apply the terms of the Employment Agreement strictly when to their benefit, and to creatively apply its terms where it better suits their purposes. The Employment Agreement does not provide me with the luxury of selectively applying its provisions. Indeed, paragraph 12 directs that the "arbitrator shall have no authority to amend or modify any of the terms of this Agreement."

11

The terms of the Employment Agreement, strictly applied, require a finding that Ballabon was terminated without cause.  They also require a finding that he is not entitled to the severance that would apply to such a termination due to his failure to satisfy the condition precedent necessary to receive such severance, that is, the execution of a release of claims.  Moreover, the express terms of the Employment Agreement clearly provide that Ballabon's equity interests in Claimant was in the form of stock options priced at the fair market value of ICTI on the date of the grant.  Moreover, the record does not support that Respondent was willing and able to purchase stock options at fair market value following his termination.

Respondent's testimony about various extra-contractual understandings and agreements supported by the testimony of Greenstein provides no refuge for Ballabon.  That testimony would require me to ignore the express terms of the Employment Agreement which specifically bars me from relying on oral statements and agreements contradicting the express terms of that Agreement.

In short, Ballabon's grievances against Claimant are many and not without some merit.  My authority, however, is defined by the Employment Agreement and is limited to addressing legal wrongs encompassed by the parties' claims and counterclaims.  The decision to reverse course and not spin off ICTI in 2011 was a disappointment, no doubt, but not a legal wrong.  A father favoring his son in a business setting to the detriment of others may or may not be bad business, but it is not by itself compensable.  Ballabon's claims before me are contractual in nature[4] and unless those grievances and the facts underlying them make out a cognizable contract claim, I am without the means to remedy them.  With the exception of the characterization of his termination and the vesting of his unvested options, Ballabon failed to establish the remainder of his contract claims, most particularly with respect to his equity interests.

---

[4] A claim for breach of the duty of good faith and fair dealing was included among Respondent's counterclaims but not addressed in any significant way at the hearing or in Respondent's legal memoranda.  In any event, where the implied covenant claim relies on the same alleged acts underlying a companion breach of contract claim and seeks the same damages or other relief sought in a companion contract claim, the implied covenant claim may not be sustained.  See Deer Park Enters., LLC v. Ail Sys., Inc., 57 A.D.3d 711, 712, 870 N.Y.S.2d 89, 90 (2d Dep't 2008) (an implied covenant claim cannot be maintained where the alleged breach is "intrinsically tied" to the damages allegedly resulting from a breach of contract").

**Termination Was Without Cause**

   Claimant relies on two provisions in the Employment Agreement for its contention that Ballabon was terminated for cause.  First, it argues that he was guilty of "gross negligence" for which no notice is required.  Second, ICTI contends that Ballabon was properly terminated for his "willful or continued failure to substantially perform his duties expressly set forth" in the Employment Agreement following notice and an opportunity to cure.  Claimant failed to demonstrate cause on either ground.

   It is fair to conclude that Respondent did not succeed in achieving his main task, that is, monetizing the patents.  But failure to succeed does not, by itself, constitute cause.  The standards at issue here, gross negligence and a willful failure to substantially perform his dues on a continuing basis, require far more.  See e.g. *AMW Materials Testing v. Town of Babylon,* 584 F.3d 436, 454 (2d Cir. 2009) (to constitute gross negligence the offending acts or omissions must evince "a reckless disregard for the rights of others or  . . . intentional wrongdoing").  There was evidence that the IDT Board was unhappy with a presentation made by Respondent and perhaps with his performance overall, but there is no evidence that Ballabon was counseled as a result.  Claimant presented no evidence that Ballabon failed to attend important meetings or produce requisite reports.  I reject as bombastic and not credible Howard Jonas's claim that Ballabon "did nothing" for 18 months.  Rather, Claimant's evidence supports the view that Ballabon's energies were directed more at spinning off ICTI than monetizing the patents in other ways.  At worst, this evidences that Respondent's efforts were misguided in the view of Howard Jonas and perhaps others, not that they were grossly negligent or reflect a willful failure to substantively perform his duties.  In short, while Ballabon's performance may have been underwhelming in Claimant's eyes, it was not grossly negligent nor were his failures willful and continuing.

   Claimant also ignores the tangible impediments to Ballabon's performance, such as the renegotiation of the deal with Kirkland & Ellis, and its negative impact on the litigation efforts of ICTI.  The disruption caused by the decision not to take the company public after hiring Ballabon specifically for that purpose can also not be discounted.  For example, as Ballabon pointed out, ICTI's budget and financials were uncertain early in his tenure.  Indeed, Respondent generally did not have an office within which to work for

13

much of his tenure as IDT sought to distance itself from ICTI reflecting counter-assertion concerns.

On a more practical level, the decision to terminate Ballabon was made by Howard Jonas for his own reasons, whether they be because of his disappointment in Ballabon's performance, to find a place for his son within the IDT edifice, to re-acquire Respondent's equity, or for other reasons.  Under the Employment Agreement, Respondent reported to the ICTI Board, not Howard Jonas, and was expected to "devote such of his professional time and attention to his performance of his duties as is, in the reasonable judgment of the Board, necessary for the fulfillment of his duties . . .."  The cause provision of the Employment Agreement makes clear that the "Company may terminate" Ballabon's employment.  Contractually, the "Company" was the IDT Board, not Howard Jonas.  The reality was quite different.  Neither the ICTI Board nor the IDT Board played a discernible role in the decision to terminate Ballabon.  Howard Jonas, by fiat, terminated Ballabon on October 26th for his own, non-contractual reasons.  Significantly, while purportedly terminating Respondent for cause, he also discussed with Ballabon possible other opportunities within IDT for him to continue to work.  This certainly would not be the expected result if Ballabon, in fact, "did nothing" as ICTI's CEO for 18 months.

Finally, Claimant's belated efforts to remedy its failure to comply with the requirements for a cause termination as provided for under the Employment Agreement were just that – belated.  Ballabon had been terminated by the time Davidi Jones forwarded Claimant's attempt at a cure letter and that letter could not undo history or unring the bell.  In this regard, I note that the head of IDT's Human Resources Department informed payroll personnel the day after the "cure" letter was issued that Ballabon was "likely to be on the payroll until December 10 but his term date will be confirmed hopefully next week." (Resp. Exh. 92).  Claimant's strained efforts to convince me that Howard Jonas's decision was without effect because it did not comply with the terms of the Employment Agreement defies reality and is rejected. (I suspect Claimant would not likely be conceding here that, in the absence of the cure letter, it owes Respondent over two years pay because he had not really been terminated by

14

Howard Jonas.).   As Respondent quite rightly observed, he was a "dead man walking" as of October 26, 2012 and the facts proved him right.

## Ballabon Failed to Satisfy Condition Precedent for Receipt of Severance

Respondent, having been terminated without cause, was entitled to severance equal to one-half of the salary that would be owed to him from the date of his termination until the end of the four year term, with a one year minimum.  As a condition precedent to receiving such severance, Ballabon was required to execute a general release.  It is undisputed that Ballabon did not do so.

New York law is clear that where a party fails to satisfy a condition precedent to a contractual obligation, a claim for breach fails as a matter of law. *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 113 (1984).  For example, in *Cloke-Browne v Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2011 WL 666187, at *3 (S.D.N.Y. 2011), plaintiff was entitled to receive guaranteed bonus payments as severance upon execution of a standard release of claims.  Plaintiff failed to execute any release in favor of his former employer.  The court concluded that a "corporate officer forfeits his right to severance by not executing a release required by his employment agreement."  This is the case even where additional material terms were added to the requisite condition.  In *Mullinix v Mount Sinai School of Medicine*, 2015 WL 328050, at * 2 (S.D.N.Y. 2015), a severance agreement with a release of claims was tendered, but the plaintiff chose not to sign it because of the inclusion of material terms not referenced in the applicable employment agreement. The court found that the plaintiff did not have to sign the release, but was under an obligation to at least bring this issue to the attention of the employer, and negotiate it with the employer, neither of which plaintiff did.  Instead, plaintiff let the release expire.  The court held that "when payment of termination benefits is contingent upon execution of a separation agreement, and the plaintiff does not sign the agreement, the plaintiff is not eligible to receive termination benefits." See also *Olorode v. Streamingedge, Inc.,* 2014 WL 3974581 at *2 (S.D.N.Y.) (plaintiff not eligible to receive termination benefits where requisite separation agreement was not executed).

The argument against Ballabon's entitlement to severance is even stronger here where he, in fact, has already initiated a legal action against Claimant, defeating the

very purpose of providing the severance.  Respondent had a choice between executing a release in exchange for severance or pursuing his legal claims against Claimant, and must live with the consequences of that decision.

For these reasons, Respondent's breach of contract claim for failure to provide severance pay is dismissed.

**Ballabon's Equity Interest Claims Denied**

Ballabon seeks the value of 5% equity in Straight Path Communications, Inc., the parent company to ICTI's successor (Straight Path IP Group, Inc.) and a related company, Straight Path Spectrum.[5]  It is Respondent's position that there was an understanding when he executed the Employment Agreement, not reflected in the document, that he was to be given a 5% equity interest in the public company once ICTI was spun off.  He reasons, as does his expert, that Straight Path Communications is the "closest possible proxy company" to the entity that Ballabon agreed to head.  As this is equity and not options, Ballabon argues that he is not required to pay for his claimed 5% interest in Straight Path Communications.  On this basis, Respondent asserts that he is entitled to the value of 5% of Straight Path Communications, or approximately $12.5 million.

In making this argument, Respondent seeks to leapfrog a number of substantial hurdles to his stating a successful claim.[6]

First, the Employment Agreement does not support his contention that he was awarded equity rather than stock options, or that he would be grossed up for the cost of acquiring any equity.  Respondent asks me to credit his testimony and that of Greenstein, the person who signed on behalf of Claimant, over the clear and express language of the Employment Agreement.  It is also notable that the options awardable

---

[5] I would note that Ballabon or his counsel at various points have stated that they were not seeking "specific performance" of the Agreement but were instead seeking economic damages. See e.g. Ballabon's Affirmation dated August 21, 2014, at paragraph 2. However, he added that "to the extent the law demands or the Arbitrator rules otherwise and I find myself in a position where I have no choice but to accept equity, I am and have always been ready, willing and able to do so."

[6] Respondent's counsel acknowledged as much in his closing when he stated: "We recognize that the damages argument requires going to a place that never happens, a place where counter-assertion was removed, a place where the company was spun off when it should have been spun off in the way it should have been spun off, with the management that Jeff Ballabon had been putting in place, with the board of directors that Jeff Ballabon was putting in place, with a complete separation from IDT."  Counsel curiously adds "This is not speculative." (Dec. 2nd Tr. 66).

to Ballabon were in ICTI solely, and not ICTI's parent or any related entity.  Significantly, the other individual shareholders of ICTI now own stock in Straight Path IP Group, and not in its parent company Straight Path Communications.

Second, Respondent and his expert conceded that the parties did not agree on the material terms of the Equity Instruments.  In effect, the parties agreed to agree, but ultimately never did.

Third, the options that were awardable to Ballabon in the Employment Agreement were to be priced at fair market value.  When presented with the opportunity to purchase a subset of those options, Ballabon declined to do so.  Moreover, he defiantly testified that he did not want to invest in a company run by Howard Jonas or a "26 year old college dropout" with no business experience and, at one point, testified that he would not even take his 5% options in ICTI under those circumstances for "zero dollars".  I would note that Straight Path Communications is directly or indirectly in the control of Howard Jonas.

Fourth, the Employment Agreement that Greenstein negotiated on behalf of ICTI expressly denies to me the ability to rewrite its terms, namely, "to amend or modify any of the terms" of the Agreement, as Respondent would have me do.  As a result, I am without authority to turn ICTI "stock options to purchase shares of the Company's common stock" into equity in its de facto parent company, or to turn the "exercise price per share . . . equal to the fair market value . . . on the date of the grant" into "zero dollars", even were I inclined to perform such transmutation.  Nor can I read into the Employment Agreement a provision compensating Ballabon for the costs he might incur in acquiring his equity interest in Claimant or its parent company based on oral communications that allegedly preceded execution of the Employment Agreement.

Finally, I cannot ignore the uncontested facts that inform this matter.  The record is clear that Claimant initially offered Ballabon restricted stock units and that it was Ballabon, for his own tax purposes, who requested that the Equity Instruments reflect options instead.  Decisions have consequences, and those consequences like his decision to ask for options instead of restricted stock cannot be undone simply because they ultimately turn out to be unfavorable.  Further, Ballabon traces much of his injury to Claimant's failure to go public (despite his counsel's claim to the contrary in closing),

17

contrary to his and Claimant's expectations.  This occurred one month after the Employment Agreement was executed.  Yet Ballabon remained with ICTI for 17 more months.  Moreover, Respondent cannot credibly argue that, whether for liability or damages purposes, the proper frame of reference is Claimant's parent company, Straight Path Communications, an entity that did not even exist during the entirety of his employment with ICTI.

For these and the reasons offered below, Ballabon's claims for an award of equity in Straight Path Communications (or any other entity) are denied.

1.  <u>Material Terms of Stock Option Agreement not Agreed to By Parties</u>

The Employment Agreement mandates that no later than fifteen days after the date of the Agreement and "pursuant to the terms and conditions of a duly authorized stock option plan" adopted by "the Company and ratified by its stockholders" ICTI was required to grant to Ballabon stock options equal to 5% of its equity capitalization. Claimant could have unilaterally set the price and terms of the stock option plan and agreement, but instead chose to negotiate those terms with Ballabon and his counsel. For reasons not fully explained, neither the stock option plan nor agreement was finalized.[7]

Claimant asserts that the stock option provision contained in the Employment Agreement is unenforceable because key terms, such as the strike price and the conditions and method of their exercise, were not agreed upon.  Ballabon acknowledges that the material terms were never agreed to, but argues it was understood that he would not be required to pay for the options, or to pay only a nominal amount.  Therefore, at most, agreement on the material terms was left for future negotiation.

In the stock option context, courts have generally viewed such agreements to agree as indefinite and generally unenforceable as a matter of law.  <u>See</u> <i>Reiss v. Financial Performance Corporation</i>, 97 N.Y. 2d 195, 198 (2001) (designated time period and expiration date for exercise is material provision of stock warrant agreement). <u>See</u>

---

[7] I note that the record reflects further drafts were forwarded by Claimant's counsel, but does not reflect and written responses by Ballabon's counsel.  I further note that Ballabon was alerted as late as March and April 2012 that the stock option plan had not been adopted but there is no indication that he took any steps to remedy the situation. (Jt. Exhs. 40 and 41).

also Teutul v. Teutul, 79 A.D.3d 851, 912 N.Y.S.2d 664, 2010 WL 5094394 (2010) (opportunity to purchase shareholder's shares in a privately-held corporation which required further negotiations as to price was not reasonably certain in its material terms and was therefore ruled invalid and unenforceable); Sugerman v. MCY Music World, Inc.,158 F.Supp.2d 316, 324-325 (S.D.N.Y. 2001) (applying the requirement of definiteness to a stock option agreement).

In the face of claims of indefiniteness, courts have found contracts enforceable where they are satisfied that the agreement can be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear. See Cobble Hill Nursing Home. Inc. v. Henry and Warren Corp., 74 N.Y.2d 475, 483 (1989). In Cobble Hill Nursing Home, despite the absence of a definite dollar amount for the purchase of a nursing home, the Court was able to find an enforceable agreement because "the option manifests the parties' unmistakable intent that price was to be fixed by a third person - the Department of Health - itself providing an objective standard without the need for further expressions by the parties."

In this case it is clear that the material terms of the Equity Instruments were not agreed to as evidenced in the parties' dramatically varying views on the strike price, i.e. fair market value vs. nominal or zero. Despite the parties' failure to agree on material terms, Claimant nonetheless provided Ballabon with the opportunity to purchase his vested shares in a letter dated June 6, 2013. In doing so, Claimant relied on the latest of the draft Equity Instruments which included an exercise time period of 180 days following termination and relied on the valuation conducted by Charles River Associates to determine fair market value, both reasonable responses under the circumstances.

Even if I were to find that the parties had agreed on the terms of Respondent's equity interests in ICTI in all respect except as to strike price, it would not avail Ballabon. As I am finding that the Employment Agreement bars any oral understanding undercutting the Employment Agreement, Ballabon's claim that there was an understanding that the cost to him of exercising the options would be nominal is not tenable. If I were to find the strike price to be as Claimant represented it to be, as found below, Respondent demonstrated that he was unwilling to exercise the options at that price. Finally, if I were to instead award Ballabon the value of those options, as also

19

noted below the options were under water and therefore had no value.

In short, Respondent is not entitled to recovery for his equity under any viable alternative arguments that he may offer.

2. <u>Ballabon Not Willing to Purchase Options at Fair Market Value</u>

Claimant provided Ballabon with the opportunity to purchase his stock options which it viewed as having vested (based on its belief that the termination was for cause) in the June 6th letter. The cost of the options was set at $145,200. For a variety of reasons, including his challenge to the validity of the strike price, Ballabon declined to purchase the options tendered.

As noted above, Ballabon then and at the hearing not only declined to purchase the options at fair market value, but disclaimed any interest in investing in a company run by Howard Jonas and his son. There was little equivocation in Respondent's views or actions. I see no reason not to take Respondent (and his counsel) at face value in this regard.

Nor did Ballabon take any appropriate, affirmative action to preserve his position. For example, he did not tender payment conditioned on this ability to recoup his payment in this arbitration. Ballabon did not offer to put the purchase money in escrow as confirmation of his intent to exercise the options. Nor did Ballabon offer an alternative valuation and tender payment in that amount. Instead, Respondent waited six months after receipt of Claimant's notice and the last day established to exercise his options to seek in this proceeding a waiver of the requirement that he exercise the options within the time contemplated by the draft Equity Instruments.

It is undisputed that Ballabon did not exercise the options and, therefore, even if the material terms of the Equity Instruments were agreed on and enforceable, Ballabon forfeited the options by failing to exercise them in a timely fashion or take appropriate steps to evidence an intent to do so.

### 3.   Ballabon Did Not Demonstrate that He Was Able to Purchase the Options

Ballabon, concerned about his privacy, limited access to his personal finances in discovery.  As a result, in proving that he had the financial wherewithal to purchase the options, he was limited to those sources of funding disclosed.[8]  Respondent stated that he owned sufficient CBS stock to cover the fair market value of the ICTI options.[9] Ballabon has failed to demonstrate, as required by applicable case law, that he was financially able to exercise his options.

First, Ballabon failed on the most basic level to prove that he even owned the CBS stock and was in a position to liquidate it as may be required.[10]  Even if he did own the stock and could liquidate it, Claimant demonstrated that the funds generated would not be sufficient to meet the exercise price of the options.

Second, Ballabon's repeated refusal to tender evidence to support his financial wherewithal permits the inference that the necessary funds may in fact not have been available.  This inference is supported by the fact that his home is in foreclosure and, as he apparently learned for the first time while testifying at the hearing, that summary judgment had been granted to the bank and that a referee had been appointed to sell his house.

Ballabon failed to carry his burden of demonstrating that he was financially able to exercise the options as may be required.

### 4.   ICTI Stock Was "Out of the Money"

Even had Respondent suffered a legal wrong relating to his equity interests in ICTI, he suffered no damages as the stock options were demonstrably "out-of-the-money."

---

[8] Respondent was repeatedly warned that his unwillingness to disclose bank records and other objective evidence could impede his ability to meet his burden of demonstrating his ability to prove this element of his claim.

[9] He also noted that his parents and in-laws were generous and would likely fund the purchase if necessary.  This claim was not supported by any evidence other than Ballabon's unsubstantiated declaration to this effect and, in any event, is speculative and not cognizable.

[10] Respondent sole evidence in support of his claim was a one-page print out from Morgan Stanley of uncertain origin and probative value reflecting a number of shares in a "restricted share and unit plan" with no details provided. (Claimant's Exh.182).

The proper measure of damages for the breach of a stock option agreement is the difference between the strike price and the market value of the stock during the exercise period. *Maxim Group, LLC v. Life Partners Holdings, Inc.,* 690 F.Supp.2d 293, 301-02 (S.D.N.Y. 2010).  Claimant introduced two independent valuations from reputable vendors which were obtained in the normal course of its business for reasons unrelated to Respondent's claims.  These valuations were relied on by Claimant and its executives, for example, upon which to pay taxes on their equity.  With respect to one of the valuations, both Howard Jonas and Respondent share disappointment as the IDT Board relied on that valuation to determine its offer to Howard Jonas to purchase his stake in ICTI, an offer that he rejected.  Ballabon offered no legitimate or cognizable basis to reject the legitimacy of those two valuations.

Further, Claimant's expert's testimony that Ballabon's options were out-of-the-money was credible and was fundamentally unrebutted.   As a consequence, even had Ballabon exercised his options, they would have been worthless and therefore he would have suffered no damages based on any alleged denial of the opportunity to exercise his options.

**Conclusion**

I find that Ballabon was terminated without cause but failed to satisfy a condition precedent to receive the severance pay to which he otherwise would have been entitled.  I also conclude that the parties did not enter into an enforceable agreement as to Ballabon's stock options.  Even if they had, those options were to be valued at fair market value and would have been under water when exercisable.  Finally, Respondent has failed to demonstrate that he was willing and able to exercise the options to which he would have been entitled to exercise.

**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION TRIBUNAL**

---

**In the Matter of the Arbitration between**
**Re:  13 160 02023 13**

      **Straight Path IP Group, Inc., f/k/a/ Innovative Communications, Inc., Claimant**

         **-against-**

      **Jeffrey Ballabon, Respondent.**

---

# AWARD OF THE ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been duly designated pursuant to the Employment Agreement dated May 17, 2011 by the above named parties and having been duly sworn, and having duly heard the proofs and allegations of the parties, AWARD as follows:

1)    Claimant's application seeking a declaration that Respondent was terminated for cause is denied and Respondent's application seeking a declaration that Respondent was terminated without cause is granted.

2)    Claimant's application seeking a declaration that Respondent is not entitled to any compensation or benefits other than his base salary through to the date of his termination is granted.

3)    Claimant's application seeking declarations that Respondent's unvested options are cancelled and that his vested options have expired is granted.

4)    Claimant's application for an award of attorneys' fees and costs under paragraph 6(c) of the Employment Agreement is denied.

5)    Respondent's application for an award of severance pay is denied.

6)    Respondent's various applications with respect to his entitlement to the ICTI stock options are denied except with respect to a finding that his unvested stock options vested upon his termination.

7)    Respondent's claim for a violation of the implied covenant of good faith and fair dealing is dismissed.

8)    Respondent's various remaining applications are denied and claims are dismissed.

9)    The administrative fees of the American Arbitration Association totaling $ 25,931.77 and the compensation of the Arbitrator totaling

$ 100,319.99 shall be borne equally by the parties.  Therefore, Claimant shall reimburse Respondent the sum of $8,365.88 representing that portion of said fees in excess of the apportioned costs previously incurred by Respondent.

10)   This Award is in full settlement of all claims submitted to this arbitration.

_____
ARBITRATOR

State of New York

County of New York

I, Alfred G. Feliu, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

February 26, 2015
Date

_____
Alfred G. Feliu

24

EXHIBIT B

# SHIB🌐LETH

Shiboleth LLP

December 6, 2013

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414
*By Email (*MicheleGomez@adr.org*)*

**Straight Path IP Group, Inc.** *f/k/a* **Innovative Communications
Technologies, Inc. v. Jeffrey Ballabon**
Case No. 13 166 02650 12

Dear Arbitrator Feliu:

Please let me introduce myself and notify the AAA of my appearance in this case.  I am Of Counsel and Head of Litigation at Shiboleth LLP.  I will be responsible for this matter on behalf of Respondent/Counter-Claimant Jeffrey Ballabon going forward.  My colleagues and our client have brought me up to speed.

I write to inform you of an open issue which requires your attention.

By letter addressed to Mr. Ballabon from Davidi Jonas of Claimant Straight Path IP Group, Inc., *f/k/a* Innovative Communications Technologies, Inc. ("ICTI"), dated June 6, 2013 (the "June 6 Letter"), unless Mr. Ballabon pays Claimant ███████ *today,* December 6, 2013, the options to which he is entitled "will terminate."  (*See* June 6 Letter, Ex. 1 hereto.)  The June 6 Letter purports to establish the value of ICTI, supposedly based upon an undisclosed "confidential report dated April 6, 2011."  The June 6 Letter also purports to establish the amount and form of Mr. Ballabon's equity as a result of his termination without cause or resignation for good cause.

The issues raised in the June 6 Letter relating to options and the value of Mr. Ballabon's equity are central to this arbitration and are currently *sub judice*.  There is no basis for the payment of ███████ by Mr. Ballabon.  There is no basis for the amount of equity that ICTI claims Mr. Ballabon is entitled to, which is only a tiny fraction of the damages actually due to Mr. Ballabon.

Mr. Ballabon cannot be compelled by ICTI, the company that terminated him without cause and then commenced this arbitration against him, to make a

payment of ███████ .  ICTI provides no supporting documentation with the letter to justify its position.  Indeed, as a result of Mr. Ballabon's termination without cause and subsequent actions by ICTI, Mr. Ballabon has been damaged in an amount not less than ███████ , as set forth in Mr. Ballabon's Answering Statement in this action.  Mr. Ballabon's damages are not conditioned upon a unilateral and unsupported strike price, nor the payment of any sum by Mr. Ballabon, and particularly not a payment amount established by ICTI mid-arbitration on a purported "confidential report" which, no doubt, was commissioned by ICTI.

The termination of these options – an action that we obviously consider to be unlawful – may not occur during the pendency of the proceeding that addresses those options.  We have requested that ICTI withdraw the June 6 Letter, but ICTI has refused to do so.  The June 6 Letter and ICTI's subsequent refusal to withdraw it is a shallow ploy to moot most of the issues in this arbitration in bad faith.  It is outrageous for ICTI to demand a six-figure payment after commencing an action where the amount and form of Mr. Ballabon's damages are main issues.

Accordingly, we request a ruling from the Arbitrator that the June 6 Letter contains issues that are currently reserved for arbitration and are to be determined by the Arbitrator, not unilaterally by Claimant, that no payment is required at this juncture, and that non-payment of such sum will not prejudice Mr. Ballabon in any way. We are prepared to be heard on this matter early next week.

Respectfully yours,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr.

cc:   Casey D. Laffey
      Christopher Hoffman
      Jason Cyrulnik



EXHIBIT C

Shiboleth LLP

April 29, 2014

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414
*By Email – MicheleGomez@adr.org*

**Straight Path IP Group, Inc. f/k/a Innovative Communications Technologies, Inc. v. Jeffrey Ballabon**
Case No. 13 166 2650 13

Dear Arbitrator Feliu:

When we spoke on Thursday, April 24, 2014, I indicated that there were open discovery issues and that the parties would attempt to resolve them without your intervention.  I also indicated that these issues were quite serious and could have an effect on the deposition schedule.[1]  While one matter has been resolved, two vital issues remain,[2] and your involvement in resolving these issues is necessary.

**INTRODUCTION**

You indicated on the April 24 call that the parties could submit briefs in advance of our discussion.  This letter-brief presents our position on the pertinent items requiring your attention: (1) the withholding by Claimant Straight Path IP Group f/k/a Innovative Communication Technologies, Inc. ("ICTI") of documents and communications pertaining to the value of the patents owned by ICTI, and (2) ICTI's invasion of Respondent Jeffrey Ballabon's privacy through its improper access to and its use and production of thousands of pages of Ballabon's personal and private AOL and Gmail emails and documents.  These matters are of the utmost importance in this case.

---

[1] The time pressure has been alleviated a bit.  Depositions originally scheduled for this week have been rescheduled to mutually agreeable dates in the near future.

[2] There is also the matter of Claimant's extensive redactions of documents.  Some redactions have been withdrawn, and we are reviewing the remainder to ascertain whether Arbitrator intervention is necessary.

In Section I of this letter, we show that Claimant has improperly refused to produce the patent valuation reports and analyses that go to the heart of both liability and damages in this case.

In Section II, we address ICTI and its parent company IDT's invasion of Ballabon's privacy and their illicit access to and copying and use of Ballabon's personal correspondence and computer files. This invasion is an extreme outrage. We cannot overstate the enormity of what ICTI has done: in direct violation of Ballabon's privacy rights and IDT/ICTI's oral and written commitment to him, they have copied and rummaged through Ballabon's personal computer hard drive, which contains a large part of his personal business affairs and private life. Short of 24-hour video and audio eavesdropping, this is perhaps the most extreme invasion of privacy that can occur in this day and age. As we discuss in Section II, Congress has made such invasions of privacy criminal. And the courts in civil cases have imposed severe sanctions for such illegal conduct.

We discuss appropriate remedies in Section III. IDT and ICTI's invasion of Ballabon's privacy must be met with strong sanctions, including the dismissal of Claimant's admittedly secondary claim in this case and the determination that there was not cause for Ballabon's termination.

## I. ICTI'S FAILURE TO PRODUCE ASSET VALUATION ANALYSES

ICTI is a patent holding company. Its primary assets are eleven U.S. patents and fourteen foreign patents. It had few employees – only two to three (including Ballabon) when Ballabon was CEO. ICTI was a division of IDT Corp. until IDT took ICTI public several months into this arbitration.[3]

IDT has at all times maintained total control over ICTI. Howard Jonas, the founder and then-CEO of IDT, terminated Ballabon. Howard Jonas then installed his son Davidi Jonas CEO of ICTI. Howard Jonas's sister, Joyce Mason, who is General Counsel of IDT, was a board member of ICTI. IDT's Chief Legal Officer, Menachem Ash, was a board member of ICTI during Ballabon's tenure. Every ICTI director during Ballabon's tenure was senior management at IDT. ICTI's board continues to have close ties to Howard Jonas and IDT. Opposing counsel in this proceeding are IDT's lawyers in other similar matters. All of these factors play a role not only in the matter at hand, but in understanding the background of the matters being presented in this letter-brief.

The value of ICTI's patents is central in this case. Ballabon was offered and accepted the job of CEO of ICTI in exchange for a salary and a five percent interest in the value to be realized through monetization of the patent portfolio,

---

[3] IDT's dishonor of its commitment to take ICTI public is an important issue in this case; the company only went public after IDT's Chairman, Howard Jonas, terminated Ballabon and installed his son Davidi Jonas as CEO of ICTI.

taking the form of equity and cash distributions in a public "non-practicing entity" or NPE. Ballabon's damages in this case are directly tied to the value of these patents. When he was terminated without cause, Ballabon was damaged by the value he would have received by monetizing the patents.

ICTI planned to monetize the patents through sale, licensing, litigation or hybrid arrangements. ███████████████████ ███████████████████████████ They cover, among other things, VoIP technology and point-to-point communications between computers over a network, which has become ubiquitous on computers, mobile phones, and even cars, televisions and appliances. The patents cover Cloud Computing and Smart Appliance technology and more.

Ballabon was present at a number of meetings where IDT and ICTI asserted the same ██████████ to investors, bankers, insurers, brokers, law firms and others. Indeed, the value of the cross-license received in Claimant's one settlement with eBay/Skype is openly shared with investors and others as itself being ██████████ – and that is for just one infringer. More significantly, while at ICTI Ballabon was privy to a number of independent valuations performed by patent brokers, analysts and law firms. ██████████ ███████████████████████ As set forth below, ICTI has improperly refused to produce these reports, as well as documents, back-up and communications relating to them.

ICTI's refusal to produce valuation reports is prejudicial to Ballabon and an abuse of the discovery process. It prejudices Ballabon's ability to prove his damages claim. It prejudices his ability to show the motive for his termination. It delays and sets back his expert's ability to draft expert reports. And the grounds asserted by ICTI to withhold these documents are patently frivolous, requiring unnecessary motion practice and diverting attention away from other parts of case preparation. The following is a list of just the analyses of which we are aware; ICTI and IDT may well possess others, and we have demanded all of them.

**A.** ██████████████████

While Ballabon was CEO of ICTI, he personally brought in the ██████████ to assess the value of the ICTI portfolio. ██████████

████████████████████████████████
████████████████ ████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████ █████████████████████████
████████████████████████████████

███████████████████████████████████████ patents.) Ballabon brought ███████ in; he was present at the meeting where █████████ presented its analysis, and he had access to ████████ detailed supporting documentation.

ICTI refuses to produce the ███████████ or any of the underlying documents, information or communications. ICTI claims that the ████████ is subject to the attorney-client privilege and not discoverable by Ballabon. This is preposterous. ████████ was brought in for consideration of service as brokers, not attorneys, to find purchasers for the patent assets, and therefore the attorney client privilege is not applicable. These facts are indisputably supported by the record:

1. Ballabon himself brought in ██████████ for possible service as a patent broker, and thus has the direct, personal knowledge of the purpose of its reports. That purpose was valuation and brokerage, not litigation.

2. The written record shows that ██████████ was brought in to serve as patent brokers. In an email from Ballabon to Howard Jonas (then-CEO of ICTI's parent company IDT and the father of ICTI's current CEO) with a subject line ███████ Ballabon asked Howard Jonas to meet with ████████ ████████████████████████████████████████████ (Exhibit A hereto; emphasis added.)[4]

3. The agreement between ICTI and ████████████████████████ ███████████████████████████████████ (*See* Exhibit B hereto; emphasis added.) It is an agreement to provide brokerage services – namely, to act as brokers in an attempt to *sell* the patents.

4. The agreement specifically states that "████████████████████ ████████████████████████████████████████████ ██████████ (*Id*. ¶¶ 7.1 and 7.3; emphasis added.)

5. Under these circumstances, patent claim charts, market sector and technology analyses, and related reports and communications do not qualify as legal advice; they are financial documents for the purpose of valuing the patents.

6. ICTI already had litigation attorneys at Kirkland & Ellis, with whom they had a legal services engagement agreement on the ICTI portfolio (indeed, an arguably exclusive engagement).

---

[4] We note that ICTI has redacted this email, which is *Ballabon's own email* to Howard Jonas. Such redactions, where no privilege could possibly be asserted, and even in cases where Ballabon himself is the sender or recipient of the email, are prevalent throughout Claimant's document production.

7. The analysis conducted by ███████ was not in anticipation of litigation – it was in anticipation of sale.

8. Much of what Claimant is now claiming privilege over was made available to a number of potential buyers in the open marketplace upon signing an NDA on a website so that they could bid on purchasing the portfolio (see Exhibits C and D hereto).

Even if the Arbitrator were to find that ███████ was retained by ICTI to provide legal services, these reports are still not subject to privilege in this arbitration. Ballabon was involved in retaining ███████ and has seen its reports. Former directors and officers are not barred by privilege from inspection of documents generated and seen during their tenure. *People v. Greenberg*, 50 A.D.3d 195, 202 (1st Dep't 2008) (holding that since the defendants, while directors and officers of the company, were privy to and on many occasions actively participated in legal consultations, the company failed to sustain its burden of establishing that the privilege is a bar to defendants) (copy attached hereto in the legal authority compendium). Thus even if the ███████████ is privileged *as against outsiders*, it is not privileged as against Ballabon. Further, in the present case, we are not even dealing with legal counsel in anticipation of litigation; we are dealing with business and financial analysis prepared in anticipation of a sale of the patents and made available to outsiders.

**B.** ██████████████████████

The ████████████ is not the only report that ICTI has withheld that ██████████████████████. ICTI's supplemental document production dated January 16, 2014 references an "internal valuation" by ███ ██████████████ The same presentation refers to an "external valuation" by ███. (*See* Exhibit E hereto.)

In June 2013, we asked ICTI to produce these analyses. On a phone call ten months later, on Sunday, April 27, 2014, ICTI's counsel represented that the ███████ was produced two days earlier, on Friday, April 25, 2014. We believe we found the ████████ yesterday, but we have not had an opportunity to review it. Nor have we had the chance to review whether the underlying documentation supporting the ████ ██████ and related communications were part of the production.

ICTI's counsel did not indicate that the ███████████ was produced. They also objected to producing valuations and communications before January 24, 2011. (Casey Laffey letter to Charles Manuel dated April 11, 2014.) They argue that reports before this date are not relevant because they are outside what they term the "Relevant Date Range," that ICTI has determined to be relevant. A document is not relevant (or irrelevant) because of its date; it is relevant because

it makes a fact more or less likely or because it may lead to other relevant evidence.

ICTI suggests that the Arbitrator endorsed this "Relevant Date Range," but that is not correct. (*See* Laffey April 11, 2014 letter at 2: "[C]onsistent with the Relevant Date Range referenced above and during last year's call with the Arbitrator, [the reports] are not relevant to this Arbitration.") This "call with the Arbitrator" is in reference to an October 7, 2013 conference call. On the call, my colleagues requested the production of correspondence that referred to the value of ICTI's cross-license with Skype. Before Ballabon was hired as CEO, IDT (which held the patents before ICTI) entered into a cross-license with Skype for the patents. Ballabon was privy to numerous representations by IDT's CEO Howard Jonas and others stating that the value of this initial cross-license for IDT was $300 million. Thus, in our requests, we asked for such communications, and ICTI objected on the basis that the cross-license preceded Ballabon's employment.

The Arbitrator did not rule on October 7, 2013 that there was some "Relevant Date Range" in place beyond which nothing needed to be produced regardless of import or relevance. Rather, the Arbitrator simply indicated that Ballabon should review the document production that was made by ICTI, and if an argument could be made in the future as to the relevance or need for these Skype documents, or any other documents, Ballabon should renew the application. As set forth in the email of Ms. Gomez following this October 7 call, dated October 9, 2013:

> A conference call was held in the above matter on October 7, 2013, and the following arrangements were made:
>
> Responses to the outstanding interrogatories exchanged by the parties are due on or before November 1, 2013.
>
> Counsel will confer in an effort to resolve any remaining issues with respect to the wording of the protective order and, if unable to do so, will submit those issues to the Arbitrator for resolution.
>
> Documents are to be produced on a rolling basis and production is due on or before December 6, 2013.

(Exhibit F hereto.)

### C.  Valuation Documents Submitted To the New York Stock Exchange

After Ballabon was terminated, ICTI was spun off from IDT into a publicly traded company on the New York Stock Exchange (NYSE). Every company that

6

goes public on the NYSE must file valuation and accounting documents to help establish value and share price.  We have requested all reports and information presented to the NYSE concerning the value of ICTI.   ICTI has refused to produce any such documents.

**D.** ███████████████████████

Other than the production of the ███████████ last Friday, the only valuation report that ICTI produced in its 47,000 pages is a single, anonymously redlined draft of a report prepared by ████████████████████████████ and commissioned by IDT.  Ballabon was made aware of this report while he was CEO of ICTI, although it was withheld from him by ICTI/IDT insiders.  In reality, the ███████████ was commissioned for tax-avoidance purposes by individuals who received grants of equity in ICTI and was intended to drastically understate the actual value of the patent assets and their equity in the patent holding company for their personal tax purposes.  (*See* Exhibit G hereto, email from Menachem Ash [IDT legal counsel and ICTI director] to IDT/ICTI attorneys stating, "As you can see, the document is in draft/redline form and was not yet finalized.  Note that outside counsel retained ███ – and that this document was drafted for tax purposes only.")  Now IDT and ICTI see that this tax-avoidance strategy can serve double duty: they want to tell this Tribunal that the same tax-driven, lowball number should be the basis for valuation in this proceeding.

To that end, IDT and ICTI, which specifically sought to keep the ███ ███ privileged when it was prepared, now assert no privilege over the ███ ███ IDT attorney and ICTI director Menachem Ash, whose many communications have been redacted apparently on the basis of privilege, took the further step of having outside counsel retain ███ (Exhibit G.)  Yet while no privilege is asserted over the █████████ in the present proceeding,[5] ICTI asserts privilege claims over the ████████ ████████, which was made available publicly on the internet to persons who would sign an NDA.

We have not received the final version or other draft versions of the ███ ███ and related communications; only the one draft has been produced.[6]

---

[5] IDT and ICTI presumably believe that the protective order will suffice to keep the conflict between the lowball ██████████ and the much higher independent valuations of the portfolio out of the hands of the IRS.

[6] It is possible that IDT and ICTI deliberately avoided finalizing the ██████████ Ballabon will testify that it was known at IDT that Menachem Ash's strategy and practice in various circumstances was not to have sensitive documents finalized, under the mistaken theory that drafts can somehow be better protected as privileged and work product.  If that is the case here, then Claimant should state on the record that the ██████████ it has produced is the only existing version.

E. ███████████████████

In recent correspondence, ICTI has also referred us to an email that references an analysis prepared by the company ████████████████████, but the analysis itself has not been produced.

In sum, 16 months into this arbitration, ICTI only two business days ago furnished the ██████████ and otherwise has failed to produce a single version of any independent report concerning the value of the only assets that the company holds.  Instead, it has produced only one anonymously redlined self-serving draft of one self-commissioned report prepared for dubious tax-avoidance purposes.

## II.  ICTI'S GROSS INVASION OF BALLABON'S PRIVACY

### A.  Background

While going through ICTI's document production from January 16, 2014, we were appalled and dismayed to find thousands of pages of Ballabon's personal AOL and Gmail private-account emails in ICTI's production.  ICTI produced emails among Ballabon and his wife, children, family and friends; emails pertaining to his finances; and other highly personal and privileged emails that ICTI had no right to see or read, let alone use in arbitration.

When we confronted ICTI's counsel about this privacy violation about three weeks ago, counsel stated that these emails were pulled from the hard drive of Ballabon's IDT-issued laptop, without providing any additional information as to how these emails got on the company laptop which Ballabon rarely used.  We requested an explanation for the breach of Ballabon's expectation of privacy and were told only that the emails were found and somehow were deemed relevant.  We demanded the laptop for a forensic examination and were ignored.

Suddenly, on a phone call with counsel late Sunday night, April 27, 2014, ICTI's counsel changed the story.  We were told that these emails were obtained from Ballabon's *personal* laptop, for which the expectation of privacy is even stronger.  Counsel told us that they have an "image" of Ballabon's laptop, which was provided by Ballabon to IDT/ICTI consensually.   Counsel offered no explanation as to how or when they obtained an image of Ballabon's personal computer, and advised us that we should check Ballabon's email "privacy settings" – as if that would explain how they have images of his personal laptop or by what right.[7]

---

[7] ICTI claims that its counsel notified Ballabon's counsel of their access to Ballabon's private emails in December 2013, but that is false. In that correspondence, ICTI identified *twelve* potentially privileged documents, many of which contained IDT employees somewhere in the email thread.  There was no way of knowing from this

We have yet to receive a clear explanation of how ICTI obtained Ballabon's personal emails or images of his personal computer.  Counsel has not told us how IDT and ICTI obtained images from Ballabon's personal laptop, what images they have, where the images were stored and from where they were extracted.  Nor do we know the full scope of ICTI's access or what emails or other files, data and documents are in their possession but as yet unproduced.  Based on what they *did* produce (thousands of pages of emails), we are sure that they invaded Ballabon's entire personal email cache, including but not limited to emails with his attorneys.

Based on the limited and conflicting information we have, we were able to piece together during the course of the day yesterday one hypothesis: that the image of Ballabon's computer may have been taken in March 2012 when discovery was taking place in ICTI patent litigation.  We can also see from the emails themselves that the image was not limited or targeted to patent-related matters but rather appears to have been an extremely broad image, perhaps even a full, general image of Ballabon's personal laptop.  *But that is not what Ballabon authorized or consented to in March 2012.*  Rather, Ballabon authorized only a "targeted collection" of documents pertaining to the matter at hand; he never gave permission for ICTI to image large segments or all of his hard drive and private email accounts.  On the contrary, he specifically stated that he would *not* permit his personal computer to be fully imaged and received a commitment that his computer was not to be fully imaged.[8]  In email correspondence dated March 4, 2012 with the company performing the data collection, and following a conversation with Ballabon in which a commitment was demanded and made to collect only material relevant to the patent litigation, ICTI general counsel (and IDT patent counsel) Vandana Koelsch specifically stated that unlike the other computers at issue (which were company computers) Ballabon's personal computer was *not* to be imaged: *"We are not imaging Jeff's computer as discussed."* (*See* Exhibit H; emphasis added.)  The emails that were produced in this arbitration to date vastly exceed what was agreed to by Ballabon for the limited, targeted collection and is in gross violation of his expectation of privacy.

Ballabon *never* gave ICTI permission to image his entire hard drive, which is what we now understand from opposing counsel to have taken place and which seems to be the case based on the production of emails that are completely unrelated to ICTI's litigation and beyond the scope of a targeted search.  More than that, Ballabon received explicit confirmation that his computer was *not* to be fully imaged.   Ballabon, like anyone else, always had an expectation of privacy for his personal laptop, personal data and files and

---

correspondence that IDT and ICTI, in actuality, had access to Ballabon's private email account, to which they made absolutely no reference, let alone to an image of his personal computer.

[8] See Exhibit I hereto, explaining the difference between a targeted search and a full imaging of a hard drive.

personal emails.  In fact, he had more than an expectation of privacy – he had a promise of privacy and of a targeted search from IDT/ICTI through their counsel.

Ballabon's privacy has been violated in an unspeakably personal way. IDT and ICTI have invaded his private business, personal and legal affairs. Ballabon is emotionally distraught knowing that IDT, ICTI and their counsel have accessed his deepest, most personal emails with his family, friends, business and political associates and lawyers.  Indeed, Claimants' assault on Ballabon has been infinitely magnified – assuming what they revealed Sunday night regarding a full imaging of the hard drive of Ballabon's personal laptop is true – because IDT and ICTI actually have illegally accessed and have wandered freely through every detail of every aspect of Ballabon's life far beyond even his e-mails.  The identification of twelve specific, privileged emails in the December 2013 letter from ICTI's counsel (see footnote 7) could only have occurred if Claimant and its counsel were carefully examining everything imaged from Ballabon's personal computer.

### B.  The Law

IDT and ICTI's actions constitute violations of criminal law and sustain civil claims under the Stored Communications Act (SCA).  (Cited provisions from the SCA are attached in the legal compendium.)  We also refer to the Electronic Communications Privacy Act (ECPA) and New York and New Jersey electronic privacy laws.  *See* discussion of the statutes in *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555-58 (S.D.N.Y. 2008) ("*Power Boot Camp I*").  (A copy of *Power Boot Camp I*" is attached hereto.)

The SCA, 18 U.S.C. § 2701(a), provides that "whoever intentionally accesses without authorization a facility through which an electronic communication service is provided; or intentionally exceeds an authorization to access that facility; and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system shall be punished." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 759 F. Supp. 2d 417, 423 (S.D.N.Y. 2010) ("*Power Boot Camp II*").  *See als*o, *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. 2011) ("*Pure Power Boot Camp III*").

The SCA creates a civil cause of action, allowing any person who is the victim of a violation of the SCA to seek damages from the violator.  *Pure Power Boot Camp II,* 759 F. Supp. 2d at 423 (*citing* 18 U.S.C. § 2707(a)). The Court may assess as damages "the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation . . . ." *Id.* (citing 18 U.S.C. § 2707(c)).  Other appropriate relief may include attorneys' fees and litigation costs and, if the violation was willful or intentional, the court may assess punitive damages.  *Id.* (*citing* 18 U.S.C. § 2707(b)(3); 18 U.S.C. § 2707(c)).

### III.  REMEDIES; PRIOR DISCOVERY SANCTIONS

As shown in this letter, IDT and ICTI have been joined at the hip throughout this saga: same controlling persons and family in management; same controlling shareholders; all of ICTI's assets transferred to it from IDT; same outside counsel; same inside counsel playing central roles in both patent valuation and invasion of privacy.   Any veil between these companies is nonexistent here.

IDT is no stranger to serious sanctions; it was recently sanctioned for engaging in conduct in certain respects similar to – but in other respects far less serious than – those at issue here: intentionally and repeatedly withholding relevant evidence with knowingly sham justifications.  As a result of this conduct, IDT was sanctioned by the district court, upheld by the Court of Appeals, in *Alexsam Inc. v. IDT Corp.,* 715 F.3d 1336 (Fed. Cir. 2013) (affirming district court's sanctions against IDT for repeated discovery abuses and noting the "severe disadvantage" caused to the other side by IDT's unethical behavior, including "[incomplete] discovery responses" and "false representations to the court").  (A copy of *Alexsam* appears in the legal compendium.) The sanctions included a finding of liability against IDT on certain of the plaintiff's patent claims, with the amount of damages reserved for trial – very similar to the principal sanction sought by Ballabon here.  While the court in *Alexsam* noted that IDT had repeatedly violated discovery orders, none of IDT's conduct in *Alexsam* approaches in severity the invasion of Ballabon's privacy that has been exposed in discovery in this case.  In this case, the remedy should be at least as forceful as the remedy in *Alexsam.*

There can be no question that these violations have prejudiced Ballabon. ICTI withholds highly relevant evidence on baseless grounds which inhibit Ballabon's presentation of fact and expert evidence and examination of witnesses.  And it has become clear that ICTI's access to Ballabon's private data has provided ICTI with unrestricted insight into Ballabon's personal life and financial and business affairs unrelated to this action, and that this information has been and will be used against Ballabon throughout this case.

Indeed, in this case, any lesser remedy than that imposed in *Alexsam* would be meaningless. Claimant's invasion of Ballabon's privacy cannot be undone. The principal intended effects of IDT and ICTI's theft of Ballabon's private data had to be harassment, embarrassment, and leverage in any dispute, such as this one.  Quite simply, since the theft of private data can never be fully remedied by the "return" of data in some form – i.e., the stolen information will not be unlearned -- the *only* remedy for what has been done by IDT and ICTI is the dismissal of the frivolous claim that the Ballabon termination was the result of non-performance, leaving the valuation issue to be determined at the hearing in November.

But additional remedies are equally important here. ICTI's improper withholding of relevant evidence despite our numerous requests for production requires necessitates an order:

1.  That ICTI produce, without delay, all drafts and final versions of the following reports and analyses, together with all related documentation and communications:

    a.  The ███████ report;
    b.  The ███████t;
    c.  The ███████;
    d.  The information submitted to the New York Stock Exchange;
    e.  The ████████████████████;
    f.  The ████████████████; and
    g.  Any and all other internal and external valuations and analyses of the IDT/ICTI patent portfolio.

2.  That the failure to produce these documents will result in a valuation determination equal to ███████: the ███████ "aggressive" net present value of ███████ (which was based on a too-conservatively estimated ███ royalty rate, adjusted to the ███ royalty rate actually achieved by Ballabon for the patents).

3.  That ICTI should be assessed for delays and legal costs for the various letters exchanged as well as this letter application because of its knowingly false factual assertions, frivolous assertion of privilege, and continuous suppression of clearly relevant, unprivileged documents.

ICTI's invasion of Ballabon's electronic communications is a clear violation of the SCA.  We are still coming to grips with the staggering implications of this violation, about which we have been misled until now, but we request that the Arbitrator issue an immediate order:

4.  That Claimant within 72 hours furnish a full written explanation, under oath, setting forth who obtained Ballabon's electronically stored documents, emails and any other personal or private data, and where, when and how the imaging and search occurred;

5.  That Claimant provide Ballabon with a list of every individual to whom access to any of his personal and private data has been given by Claimant, IDT and/or their agents;

6.  That Claimant produce all persons with information regarding the imaging, receipt and distribution of Ballabon's electronically stored documents, emails and any other business, personal or private data for depositions at the office of the undersigned on May 7, 2014, and that such persons bring

with them all documents, electronically stored information and communications related to Ballabon;

7. That Claimant shall immediately deliver to Ballabon the image or images of Ballabon's personal computer hard drive that was/were made in or about March 2012 or at any other time;

8. That all copies of Ballabon's personal and private emails and other electronically stored documents and information obtained from his personal computer be preserved and turned over to Ballabon immediately;

9. That any remaining copies of Ballabon's personal and private emails and other electronically stored documents and information any other information obtained from his personal computer in any form now in Claimant's possession or control be immediately, permanently deleted and destroyed;

10. That Claimant immediately deliver to Ballabon's counsel for forensic examination the business laptop used by Ballabon at ICTI.

We ask that the relief set forth in paragraphs 4-10 apply not only to ICTI and IDT but also to any companies and individuals affiliated now or at any time with ICTI and IDT and to their agents.

Finally, the intentional, premeditated and pervasive nature of Claimant's discovery violations and violations of our client's privacy – and their dissembling about the source of the private information – warrants:

11. That all emails, documents and information obtained from the improper imaging of Ballabon's personal computer be precluded from use in this litigation; and

12. The imposition of monetary sanctions, attorneys' fees and (upon the hearing) punitive damages pursuant to the actual authority of this Tribunal and the statutory provisions for sanctions and legal fees of the SCA, cited above.

**CONCLUSION**

Counterclaimant Jeffrey Ballabon requests that the Arbitrator grant the remedies specified above for the abuses described in this letter.

Respectfully yours,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr.

13

Copies: Casey Laffey
        Jason Cyrulnik
        *By Email*

# SHIB⊕LETH

EXHIBIT D

Shiboleth LLP

June 16, 2014

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414
*By Email – MicheleGomez@adr.org*

**Straight Path IP Group, Inc. f/k/a Innovative Communications
Technologies, Inc. v. Jeffrey Ballabon**
AAA Case No. 13 166 02550 12

Dear Arbitrator Feliu:

　　We write to inform you that several discovery issues remain. These issues are:

1. <u>Extension of time for expert reports.</u>  Claimant has indicated that it will not consent to extending the date for expert reports. However, as a result of Claimant's selective withholding of relevant non-privileged information, including a 3,000-page document production that Claimant produced for the first time last Friday at 4:30 p.m. (see item 2 below) and much of which Claimant continues to withhold, Respondent has been prejudiced and his ability to complete an expert report has been delayed.

2. <u>Claimant's failure to make a complete production.</u>  While pieces of relevant information – such as the ████████ and the ██████ data room – have trickled in just recently and only after we were forced to make applications to compel to the Arbitrator, we are still missing the relevant emails and documents surrounding this information.  In addition, there are still relevant documents we know to exist that Claimant continues to withhold.  For example, the Arbitrator ordered Claimant to produce documents relating to ████████ potential investment in the company. Following this order, Claimant indicated that it performed a supplemental search and "can confirm that neither Straight Path nor Kirkland & Ellis has any documents responsive to the request."  Exhibit 1 hereto, however, is documentation that Kirkland & Ellis was granted permission to show ████████ "information and analysis" in its possession "without restriction" and "without limitation in connection with a potential investment in Claimant."  It is understandably difficult for us to accept counsel's claim that Kirkland & Ellis shared no documents whatsoever with ████████ related to this potential investment.  Accordingly, we know that certain documents exist that Claimant is withholding, we know it took over a year to produce ██████ documents which were never privileged in the first place, and thus we have no confidence that the documents relating to damages that we have requested have been completely produced.

3. <u>Subpoena to depose Ira Greenstein</u>.  After many weeks of attempting to work with opposing counsel and with Mr. Greenstein's other counsel, this current Jonas company executive and former ICTI President and Director – who was identified as a vital witness for deposition at the outset – must be subpoenaed for his deposition.

4. <u>Permission to depose Liore Alroy and Joyce Mason</u>. Given Claimant's extraordinary efforts to disavow Ira Greenstein, it now makes it necessary to bring in other key witnesses, whom they will not be able to disown.   We will only require less than two hours for each.

5. <u>Jeffrey Ballabon private computer files</u>.  Several weeks after we raised this issue and sent ICTI's counsel a set of questions to be answered by Kirkland & Ellis, all we have received in response is an unverified assertion that, in essence, no one knows how thousands of Jeffrey Ballabon's most personal computer files slipped through the document-checking cracks as part of the document production by IDT/ICTI in at least two cases (including this one). Claimant has already demonstrated a lack of forthrightness in this litigation, and similarly was sanctioned for severe discovery abuse last year by the federal courts including the United States Court of Appeals for the Federal Circuit. We will not allow potentially criminal conduct to be whitewashed with an unverified explanation.

6. <u>Document redactions</u>.  Claimant unredacted a limited number of documents last week. We continue to review these and will do our best to work through this issue.

These issues are tied to the current litigation schedule, requiring some modification of dates, but, barring further barriers thrown up by Claimant, they will not affect the November hearing date. There is ample time to complete pre-hearing procedures before the November 6, 2014 hearing. But Respondent must have the discovery he has demanded, without further obstruction and delay, to prepare his case for the hearing.

## Extension for Expert Reports; Incomplete Production

The first issue concerns Claimant's (i) unreasonable delay in producing and (ii) continued withholding of key documents relating to damages with less than a week before expert reports are due. Such delayed production and withholding of damages-related documents – which were requested and should have been produced a year ago – has prejudiced Respondent's ability to complete an expert report.  Now, an extension is needed for the submission of expert reports and expert depositions, to which Claimant states it will not consent. On no fewer than five occasions we have stated that Claimant is withholding essential information relating to damages and that such withholding inhibits Mr. Ballabon's ability to submit expert reports. Deposition testimony finally corroborated that assertions made by Claimant to withhold many of these documents (i.e., that they were never shown to third parties) were not true.  These discovery delays make it simply impossible for Mr. Ballabon to submit an expert report by June 20, 2014.

A.     **Respondent's Year-Long Requests for Documents**

Since Respondent's first Demand for Discovery and Inspection in June 2013, Respondent has been continually requesting all documents reflecting or related to the value of ICTI's patent portfolio. Now, after one year of continued requests, about a dozen letters back and forth between counsel, and multiple letters to and calls with the Arbitrator, Claimant just ten days ago provided us access to the ███████ data room (which was shown to third parties and never privileged). Then, last Friday, June 13, 2014, Claimant produced over 3,000 pages of documents relating to ███████ – withheld for a year on the unfounded basis of privilege – together with an 85-page privilege log. All of this information goes directly to damages – with a damages expert report due in less than a week.

We demanded the production of *all* ███████ documents in June 2013. We sent numerous letters and emails to Claimant's counsel and have made multiple submissions to the Arbitrator regarding ███████ documents in particular. (*See* Appendix I.) With regard to ███████ documents alone, it is now clear that Claimant has withheld these documents for a year on groundless assertions of privilege, as Claimant's assertions that no ███████ information was shared with third parties have been shown to be untrue.

Claimant's discovery obstruction is not limited to ███████ There is also the issue of underlying documents and surrounding emails and communications with other brokers, purchasers and investors (such as ███████████ and ██████), and relating to valuations such as those prepared by ████████████████ ██████ and ████████████████.

For example, while ICTI produced the version of the ████████████ which purportedly was filed with the New York Stock Exchange, no emails and other correspondence surrounding its preparation and filing were produced. One of the core issues with both the ███████ and ████████████ is the role played by IDT and ICTI in influencing those valuations, but none of the relevant communications have been produced.

Likewise, regarding ██████, Mr. Ballabon was told that Menachem Ash of IDT, who also served as a Board member of ICTI, was directly involved in dictating the outcome of a low valuation made for tax purposes, yet there are no communications between Mr. Ash and ██████ on the subject – indeed, no communications at all. Mr. Ballabon also knows first-hand that, despite Howard Jonas and Menachem Ash's denials during their depositions, there have been numerous communications related to the value of the patents, including discussions with third parties such as investors, insurance companies and others. We have not located any such communications in Claimant's production. The ██████ and ████████████ themselves are only a part of the picture.[1] Claimant's involvement in and influence on the values in such reports and their communications surrounding such reports all are highly relevant to the value of Respondent's interest as well as to the behavior of both parties to this dispute.

---

[1] We note that we are using the word "report" but we have not and are not now limiting our request to documents and communications which Claimant wants to designate "reports" as opposed to analyses, valuations, or any other evidence of value. This semantic game is something Claimant also has seized on to evade production.

In addition, after the Arbitrator ordered ICTI to produce documents and materials shared with ██████████ ICTI informed us that it conducted a search and neither Straight Path nor Kirkland & Ellis has any responsive documents.  This is unfathomable considering that Kirkland & Ellis represented ████████████ in connection with its potential investment in the company and was granted carte blanche by IDT and ICTI to show such information to ████████████ (Exhibits 3 and 4 hereto.)

Further, we continue to maintain that ██████ was not actually retained to perform legal services, and within the 3,000 documents produced is further evidence of such.  As the Arbitrator is well aware, Claimant's representation throughout this litigation has been that ██████ was brought as potential lawyers.  The veracity of this assertion, however, continues to unravel as more documents are produced. In Claimant's most recent production from last Friday, Vandana Koelsch, Claimant's general counsel, introduced herself to Ragnar Olsen of ██████ *in May 2012* as follows:

██████████████████████████████████████████████
████████████████████████████████████ █████
██████████████████████████████████

(Exhibit 2 hereto; emphasis added)

First, there is no reason that this email was withheld for a year, when it has nothing to do with legal advice or the contemplation of litigation.  Second, this email provides further documentary evidence of what Mr. Ballabon has argued all along: that ██████ was brought in from the start to serve as patent brokers and there is no privilege attached.  Recall that Mr. Ballabon was the CEO of ICTI and Ms. Koelsch was his general counsel during this period. No one else at ICTI was dealing with ██████ This email confirms that Mr. Ballabon and Ms. Koelsch both viewed ██████ as brokers.  Meanwhile, Claimant has produced nothing other than a declaration from ██████ – which does not own the privilege – that legal services were contemplated. It begs the question why Claimant did not obtain a declaration from Ms. Koelsch, and whether any of Claimant's representations can be taken at face value.

Considering that ICTI knowingly withheld non-privileged documents and communications relating to damages that we knew to exist (e.g., ██████ ██████ ██████ and ██████), we are simply not convinced that *all* documents relating to damages, particularly those which we might not be aware of, have been produced.  ICTI has played word games with titles and categories of documents, such as the withholding of "data room" documents for nearly a year because, they now argue, our wording did not encompass that phrase, or whatever phrase of convenience they choose to apply. We cannot know with precision what we do not have.

ICTI's improper withholding of documents and misleading claims of privilege have made preparation of an expert report impossible. There must be a ruling that all correspondence and other documents associated with the valuation analyses must be produced, or a factual presumption will be made in Respondent's favor with respect to valuation, as well as a postponement of expert reports pending same.

**B.**   <u>Prejudice to Mr. Ballabon</u>

ICTI's withholding of the most important valuation documents may, in one sense, come as no surprise.  ICTI readily produced and emphasized repeatedly in deposition the ████████ ████, which was a low-ball, tax-driven draft which valued the entire patent portfolio at ████████ at the same time the company was claiming ████████████ valuations to investors, and when the biggest law firms in the country were in a bidding war to undertake multi-year patent litigations on full contingency, the cost of any one of which could eclipse that total value.  What makes this self-serving style of selective production even more extraordinary is that the ████████ was commissioned through outside counsel and kept in uncompleted draft form precisely in order to shield it in other circumstances, and yet Claimant seems to have no qualms about flaunting it every opportunity they get while hiding a multitude of documents with far less colorable claim to privilege. Meanwhile, we have waited a year to obtain the full ████████ documentation – the underpinning of a ████████ valuation by a third party.  Claimant has for a year tactically delayed, to Respondent's disadvantage, the production of documents necessary for expert analysis in this case. This is devastating to our (and our expert's) hearing preparation.

From the time this issue came to a head, we noted to opposing counsel and the Arbitrator that the withholding of non-privileged materials relating to damages would inhibit Mr. Ballabon's ability to submit an expert report:

- "ICTI's refusal to produce valuation reports is prejudicial to Ballabon and an abuse of the discovery process.  It prejudices Ballabon's ability to prove his damages claim.   It prejudices his ability to show the motive for his termination.   It delays and sets back his expert's ability to draft expert reports."  (Manuel Letter to Arbitrator Feliu, dated April 29, 2014, at 3, Exhibit 5 hereto.)

- "With opening reports due in less than one month, Claimant's improper concealment of these documents among so many others essential to expert analysis has stymied our client." (Manuel Letter to Arbitrator Feliu, dated May 25, 2014, at 2, Exhibit 6 hereto.)

Claimant, whose litigation costs are indemnified by IDT, a billion-dollar corporation, is well aware that Mr. Ballabon must be very conscious of his budget and must focus the expert's efficient expenditure of time in examining the valuation documents.  Without the most critical valuation documents at hand, the expert is wasting his time on insignificant and incomplete documents.  Mr. Ballabon knows from his time as CEO that ████████ ██ created and shared the requested documentation contemporaneously with the events at issue that is necessary for expert review and analysis and to challenge the specially commissioned low-ball valuations. ICTI's year-long withholding of these non-privileged documents has inhibited Mr. Ballabon's ability to furnish an expert report.

There is also an imbalance with respect to access to documents.  While ICTI/IDT holds all the documents from Mr. Ballabon's tenure as CEO, including contemporaneous e-mails to and from Mr. Ballabon's work and personal e-mail accounts, Respondent has almost none of his work e-mails. ICTI's ongoing withholding of documents that Respondent knows to exist, knows to be relevant and responsive, and knows to be non-

privileged makes it all the more essential that ICTI make the complete production that has yet to be made.

As the Arbitrator acknowledged during the May 27, 2014 call, Respondent and this Tribunal have no way of knowing which documents Claimant possesses, and which documents Claimant has withheld on the basis of "privilege" or otherwise.  Claimant's attention has been drawn to these withheld documents on multiple occasions, as detailed above and in Appendix 1, the earliest such occasion being during document collection and early document production. There now is evidence that Claimant has been withholding non-privileged, highly relevant documents which are detrimental to Claimant's case, to Mr. Ballabon's detriment, and has been disclosing selective facts to Respondent and to the Arbitrator only as we were able to home in on particular missing items and categories, raising the question of what has still not been produced. I refer the Arbitrator to my May 25, 2014 Letter (Exhibit 6), where I set out in detail Claimant's tactics in regard to this matter.

## Ira Greenstein Deposition Subpoena

### A.  Greenstein's Central Role

Ira Greenstein is a key fact witness in this case.  Mr. Greenstein has direct, firsthand knowledge of facts and events that are at issue and are necessary to the discovery of truth.  Mr. Greenstein was a member of the ICTI Board and President of ICTI when Mr. Ballabon was hired, and played a key role in Mr. Ballabon's recruitment for the position.  Mr. Greenstein worked with Mr. Ballabon during his entire tenure as CEO and has highly relevant knowledge of both Mr. Ballabon and Claimant's actions. Mr. Greenstein continued to serve as Counsel to the Chairman of IDT, Howard Jonas, who terminated Mr. Ballabon, and remains in that position now. Mr. Greenstein also worked during the relevant time and continues to work in various senior capacities at other Jonas-controlled companies, including those Mr. Ballabon was directed to work for during his tenure at ICTI – for example Genie, a company on whose board Mr. Greenstein sits and of which he is president.[2]  Mr. Greenstein also served as President of IDT for ten years, from 2001 to 2011, and was a director of IDT from 2003 to 2006.[3]

Because ICTI openly fears that Mr. Greenstein will testify out-of-line with the "company position" as put forth by the Jonases and Menachem Ash, who have tried to disavow Greenstein and discount him as a "friend of Jeffrey Ballabon," ICTI has abandoned Mr. Greenstein, declined to produce him for his scheduled deposition, declined to agree to reschedule any deposition, declined to indemnify him and declined to provide him with legal representation (while providing every other ICTI/IDT witness with legal representation).  Indeed it is our understanding that Claimant is taking the position that Ira Greenstein is a third party and need not appear for depositions, even though he is employed by the same company as Howard Jonas and Menachem Ash and played the role of both Director and management at ICTI. ICTI's counsel have gone to great lengths to distance themselves from Mr. Greenstein and his anticipated testimony, but he remains to this day a senior executive at not one but at least two Jonas-controlled companies including IDT and Genie, and is as much their client as Howard Jonas, Davidi Jonas or Menachem Ash.

---

[2] Mr. Ballabon's work for Genie is central to rebut certain contentions made by Claimant.
[3] http://www.idt.net/about/management.aspx.

### B. **The Real Reason Claimant Does Not Want Greenstein Deposed**

Claimant's desire that Greenstein never testify has nothing to do with his being "friendly" with Ballabon, and everything to do with the fact that, if Greenstein's testimony is consistent with the documentary record, it will decimate Claimant's position that Ballabon was fired for cause, let alone the absurd canard that Ballabon "did nothing." Indeed, the documentary record shows that Greenstein vociferously protested and denounced the mistreatment of Ballabon, the failure of ICTI to honor its basic commitment to support Ballabon's efforts, and the shallow scheme of Howard Jonas to demean and denounce Ballabon as the pretext to place his 25-year-old, college-dropout son Davidi into Ballabon's position as CEO of ICTI – after which (following 18 months of foot-dragging with Ballabon) Jonas promptly spun off ICTI from IDT and took it public.

Friendship with Ballabon? What is indisputable are Greenstein's far longer and deeper relationship with Howard Jonas and his ongoing expressed frustration at Ballabon's treatment by Jonas – at the bidding of Jonas family members and Ash – in furtherance of agendas contrary to their fiduciary duties and their contract with Ballabon. Greenstein, a Columbia Law School graduate and former partner at Morrison & Foerster, has repeatedly challenged Jonas's sons and Ash's behavior. Greenstein wrote in an email dated July 25, 2011, responding to Ash and Shmuel Jonas's [4] attempt to unilaterally alter Ballabon's contract after they aborted the publicly announced spin-off which had been filed with the SEC and publicly announced, and for which Ballabon had been hired:



(Exhibit 7.)

Joyce Mason, IDT's general counsel, Howard Jonas's sister and, along with Greenstein, an ICTI board member, echoes Greenstein's criticism: ██████████████ ██████████████                                            ██████ Greenstein continued his challenge to the implications of IDT's actions: ███████████████ ████████████████████████████████████████████ ████████████████████████████████████████ (*Id.*)

A year later, after Mr. Ballabon demonstrated to the IDT board's satisfaction the need to spin off, despite their embarrassment and discomfort at (and fear of consequences for) having announced and aborted a spin-off one year earlier, Howard Jonas's son Davidi arrived at IDT. This was followed by Howard Jonas's making it known that he wanted Davidi to be CEO of ICTI – at the expense of Mr. Ballabon's job and contract – and maligning of Mr. Ballabon.

---

[4] Shmuel Jonas, another son of Howard, is now the CEO of IDT. Other family members continue to populate senior management. Remarkably, these public companies are run like the Jonas corner deli. Ballabon was but one victim of some of the most blatant nepotism at any NYSE-listed companies.

Greenstein, appalled by the treatment of Mr. Ballabon – and by the lunacy of spinning off ICTI to the dropout son – protested.  Referring to a similar earlier situation where an outside professional whom Greenstein brought to the company solved a longstanding company problem only to be ousted and disparaged so as not to pay him for his work (a recurrent Jonas pattern, as we will demonstrate), Greenstein wrote on August 23, 2012:



(*Id.*)

Greenstein also had an inkling of the devastation in value caused by the Jonases and Ash's actions, including the delays caused by self-dealing and nepotism. On August 7, 2012, as Ballabon was leading the way to complete the long-delayed spin-off, and while Ash and the Jonas brothers were conspiring to delay or kill that spin-off, Greenstein met with Kirkland & Ellis patent litigator David Callahan, and then wrote:

Howard,

Ira

(*Id.*) As we know, of course, that timing – and the unleashing and accelerating shareholder realization of value – was postponed yet again in order to replace Ballabon with Jonas's son.  A full year of value – probably worth nine figures – was lost on patents that expire in September 2015.

Finally, we believe Greenstein has insight into the extreme and unethical behavior engaged in by Claimant in this proceeding, both in terms of misrepresentations made to the Arbitrator and under oath by witnesses in deposition, as well as in terms of the way discovery has (and has not) been managed.  This is why ICTI wants Greenstein never to testify.  Apparently it is relying on the "honest witness" exception to the rule of producing key company witnesses with intimate knowledge of the facts.

### C.  **Necessity for the Subpoena**

We refer the Arbitrator to Appendix II, attached hereto, for a detailed chronology of the factual history and correspondence giving rise to this representation issue.  We have attempted to contact Mr. Greenstein's purported counsel on about ten occasions.  We are told by her as recently as Friday, June 6, that she is still in the process of working out "representation issues" with Mr. Greenstein and IDT (which her firm has represented in the past), and that she will get back to us.  She never did.  This nonsense has gone on for more than a month, since we learned that Claimant had decided to not produce Mr. Greenstein for his originally scheduled deposition.  (Remember: Greenstein has been on our short list since day one.)  The Arbitrator in our last conference call left the burden on Respondent to arrange the Greenstein deposition. We did exactly that, only to be informed once again that Greenstein's counsel has unspecified "representation issues" with IDT and ICTI.  There is a very simple solution: issuance of an AAA subpoena for Mr. Greenstein's deposition.

### **Liore Alroy and Joyce Mason Depositions**

Given the ongoing manipulations and preemptive attempts to discredit Mr. Greenstein, we respectfully request the right to call the two remaining ICTI Board members with knowledge of Mr. Ballabon's services, also close intimates of Howard Jonas and senior management in his companies: Jonas's sister, General Counsel Joyce Mason and his Deputy Chairman Liore Alroy.  We will not require more than two hours for each witness.  The Arbitrator previously ruled that we could apply for additional depositions as necessary.

ICTI's first two Board members were Ira Greenstein and Joyce Mason.  Greenstein and Mason were replaced as Board members by Menachem Ash and Liore Alroy.  The only testimony we have from any Board member of the company, to whom the CEO reported, is Menachem Ash, the current EVP of Legal Affairs for IDT, for whom hundreds if not thousands of communications have been redacted.  Mr. Ash was one of the the primary schemers who arranged for the illicit ouster of Mr. Ballabon. Now that Claimant has invested in a blatant attempt to undermine Mr. Greenstein's veracity and keep him from ever testifying, we require the other members of the ICTI board to help establish both the facts and the respective credibility of the parties.

### **Jeffrey Ballabon Private Computer Files**

Mr. Ballabon is unable to confirm that the email privacy issue is resolved without at the very least a non-evasive, signed corroboration from Kirkland & Ellis.  At issue are thousands of Mr. Ballabon's personal emails (and maybe untold thousands more).  We do not have a verified answer as to how these emails came into Kirkland & Ellis's possession, where they were maintained all this time, why they were maintained all this time, whom they were shared with, and why they were not deleted by Kirkland & Ellis if they were not relevant to the underlying case, which we know to be Kirkland & Ellis's practice.  We do not have a verified chain of custody.

Absent verification, we cannot tell for sure whether these emails were obtained in other ways, especially considering that we were first told that Mr. Ballabon's personal emails were taken from his company laptop, with the justification having something to do

with his settings to that computer. We also need an declaration by someone at Kirkland & Ellis laying out the facts and some evidence of what was in the drive, the chain of custody, and why if they came into possession of such private documents they would have kept them and not deleted them. Claimant's counsel's third-hand hearsay report of what was done with Mr. Ballabon's private files does not come close to fulfilling IDT/ICTI's disclosure obligations with respect to a potentially criminal as well as civil privacy violation. In this day and age, with everything from Rule 26 to Sarbanes-Oxley to criminal privacy violations to severe civil sanctions breathing down lawyers' necks during document production, it is utterly impossible to accept Claimant's counsel's explanation that thousands upon thousands of Ballabon's most personal computer files simply slipped through the cracks of (a) the imaging firm that received Ballabon's personal computer, *and then* (b) Kirkland & Ellis's own internal document control procedures, *and then* (c) the outside document production firm's detailed review, *and then* (d) the review of all parties in the underlying litigation,  *and then* (e) the eyes of Claimant, the two major firms representing it, and their document review firm in this case.

IDT/ICTI were sanctioned for severe discovery abuse last year by the federal courts including the United States Court of Appeals for the Federal Circuit, and we will not allow potentially criminal conduct to be whitewashed with a phone call. The *Alexsam* decision makes it essential that we receive information from the source here; we share the *Alexsam* court's view of the level of trustworthiness of IDT and its affiliates. We also need a copy of the hard drive that Kirkland & Ellis received from the document vendor, and we need to see Mr. Ballabon's company laptop so that we can examine it.

*************************************************

In sum, Claimant, which launched this arbitration to avoid its clear obligations to Respondent, continues to obstruct key discovery in this case –   in terms of both documents and witnesses – to prejudice Respondent's case and mislead this Tribunal. The tremendous imbalance between the monetary resources and access to information and documentation of Claimant and Respondent apparently is not enough. As we have noted in the past, this manipulation is consistent with prior conduct by IDT in litigation. *See Alexsam Inc. v. IDT Corp.,* 715 F.3d 1336 (Fed. Cir. 2013) (affirming district court's sanctions against IDT for repeated discovery abuses and noting the "severe disadvantage" caused to the other side by IDT's unethical behavior, including "[incomplete] discovery responses" and repeated "false representations to the court"). We have truly reached the point in this case where we feel the Arbitrator must address sanctions (including preclusion and the shifting of legal fees), as the Federal Circuit did a year ago.

Respectfully yours,

*Charles B. Manuel, Jr.*

Charles B. Manuel, Jr.


Copies: Claimant's Counsel

# Appendix I

**Respondent's Requests for Documents and Related Correspondence**

As the Arbitrator is aware, since June 2013 in Respondent's first Demand for Discovery and Inspection, Respondent requested _all_ documents reflecting or relating to the valuation of the patents in general, including ████ documents:

- "Each and every Document relating to or reflecting . . . Petitioner's dealings or relationship with ████ . . .";
- "Each and every Document reflecting the valuation of Petitioner and/or the patents held by Petitioner including without limitation, those Documents . . . [p]repared externally by any third party for Petitioner . . ."; and
- "Each and every Document referencing the valuation of Petitioner and/or the patents it holds submitted directly or indirectly to … [a]ctual or potential investors in Petitioner or IDT and its subsidiaries and/or affiliates."

(Respondent's First Demands for Discovery and Inspection, June 14, 2013, at 18, 21 and 22.)

The first substantial productions were made by the parties on January 16, 2014. Claimant made subsequent document productions on or about April 4, April 11, and April 28.  After having a chance to review Claimant's productions, we noticed significant gaps, specifically with respect to documents relating to ████ ██ valuations and communications around same, and damages in general.   On April 3, 2014, we noted these gaps to ICTI and urged it to produce such documents responsive to our requests. Under the subheading titled "Documents Relating to the Value of the Patent Assets," we pointed out:



With the exception of one draft ████████████ (████████ . . . .  we have not located in Claimant's production other documents responsive to these requests. . . . For example, Respondent's Request No. 3(g) calls for documents relating to Claimant's dealings with ██ ██ including ████ proposal and valuation of the patents. As you know, ████ performed a patent analysis covering certain applications and valued the net present value ("NPV") of the patents' monetization at greater than NPV ████████████ ████ We did not find the ████████  ████ analysis in Claimant's production. . . . [P]lease produce [these documents] forthwith together with all other documents responsive to [our document requests], and if any of the documents are being withheld on privilege or other grounds, we call for a log of such documents and a description of the privilege or other ground asserted.

(Manuel Letter to Laffey and Cyrulnik, April 3, 2014, at 1-2.)

Claimant responded to my April 3, 2014 Letter by indicating that *all* relevant, non-privileged documents have been produced, and that the ███████████ was withheld on the grounds of attorney work product and attorney-client privilege:

> You are wrong.  Claimant has produced all relevant, non-privileged documents . . . responsive to [your requests]. . . .  Moreover, the ██████ ████████████ referenced in your April 3 Letter was properly withheld on the grounds of work product and attorney-client privilege. . . . Accordingly, the ████████ ████████ and related documents constitute protected work product that is not discoverable and will not be produced.

(Laffey Letter to Manuel, April 11, 2014, at 1-2.)

At the time of Claimant's April 11 Letter, Claimant knew that █████████ claim charts (and quite possibly other analyses and documents) had been shown to third parties and that and other communications were no longer privileged (if they ever were), and the representation in this April 11, 2014 letter – that "*Claimant has produced all relevant, non-privileged documents*" – was a misrepresentation.  Further, we had never limited our request solely to a "████████ ████████████," but requested *all documents* relating to ████████

We urged ICTI again to reconsider our requests and produce this information.  We explained that ████████ documents were shown to third parties, and that there was no privilege.  This time, in addition to our broad requests for documents, we specifically requested *claim charts* and, once again, *all* related documents:

> Our document demands called for the ████████ ████████████████, *claim charts and all related documents*.  These documents go to the heart of valuation and damages in this case . . . . This has nothing whatsoever to do with the attorney-client privilege or attorney work product.

(Manuel Letter to Laffey and Cyrulnik, April 22, 2014, at 3; emphasis added.)

Claimant's continued refusal to produce these non-privileged documents after our good faith attempts to acquire the same ultimately forced us to escalate the issue with the Arbitrator.  We wrote to the Arbitrator one week later, arguing that ICTI "has improperly refused to produce these reports, *as well as documents, back-up and communications relating to them.*"  (Manuel Letter to Arbitrator Feliu dated April 29, 2014, at 3.)  I continued in the letter, "Further, in the present case . . . we are dealing with business and financial analysis prepared in anticipation of a sale of the patents *and made available to outsiders*."  (*Id.* at 5; emphasis added.)

In response to the above correspondence and our multiple requests for all documents including valuations and claim charts, Claimant's response to the Arbitrator on May 2, 2014 denied that a "*litigation analysis*" was ever disclosed "to any third party," which is absolutely inconsistent with anything we had been saying or asking for:

> Finally, Respondent's unsupported statement (at 5) that the ████████ ████████████████ was made available to third parties who signed an NDA is flatly false and devoid of evidentiary support for a reason. ICTI never disclosed the analysis to any third party, and to the extent Mr.

Ballabon means to suggest that he did so, such actions constitute blatant violations of Mr. Ballabon's non-disclosure agreement and his fiduciary duties to ICTI. For all of these reasons, Respondent's request for production of the ▮▮▮▮▮ material should be denied.

(Casey Laffey May 2, 2014 Letter, at 5; emphasis added.)

We *never* defined our request as a "litigation analysis."  That is *their* self-serving label for relevant responsive documents they want to withhold.  Rather, from day one we requested *all* ▮▮▮▮▮ documents.  And as shown in our previous letter to the Arbitrator dated April 29, 2014, ▮▮▮▮▮ did indeed share materials with third parties:

> [DAVIDI JONAS]: ▮▮▮▮▮ created, a data room for third parties who are considering either taking a license or acquiring the patents to view what are called claim[] charts, where it basically shows the elements of the claims of the patent and the technology or the particular company's technology, and sort of showing how the claims map onto the technology to show that there is a potential infringement so that these parties could make an assessment as to whether they themselves perhaps were infringing, whether their competitors were perhaps infringing. So, you know, that was in fact part of the NDA and the NDA also covered whatever communications we would have had between ICTI and the counterparties and those NDAs.
> . . . . .
>
> Q. And how many parties have entered the room on the Internet?
>
> A. I would have to go back and look. I think the prospective letter that was sent out maybe went out to something like 20 companies, not all of them expressed interest, maybe, I think more than half did. I think of the, let's say if you want a ballpark is 14 or 15 companies that showed interest. I would have to ask ▮▮▮▮▮] staff to tell me how many people entered the data room, but certainly a significant portion of them I believe entered the data room and looked through the claim charts to get a better understanding of the patents.

(Davidi Jonas Deposition Tr. (rough), dated May 20, 2014, at 18-20.)

We acknowledge that we used the terms "analysis" and "valuation" when making our requests; however, we never limited our request TO THOSE TERMS and have always requested *all documents and communications*, and we even specifically requested the claim charts which were shared with third parties.  Claimant had these documents, not us, and Claimant's failure to admit after all that time and all those applications and letters that certain documents, whether they were analyses, claim charts, correspondence or whatever description or label claimant wishes to use, were shared with third parties and not privileged, can only be described as bad faith. Claimant hid the ball for a year and asserted misleading, misrepresentative statements – not only to us, but also to the Arbitrator.

What claimant is doing as regards ▮▮▮▮▮ they are doing regarding a host of similar responsive documents and communications: it is the tip of the iceberg.

# Appendix II

**Factual Background**

- On February 6, 2014 we had a call with the Arbitrator where we asked to depose five ICTI witnesses and ICTI argued that there should be less.  The Arbitrator permitted four depositions, with additional depositions upon good cause shown.  Mr. Greenstein was a potential deponent from day one, and Claimant did not indicate that it was not representing MR. Greenstein.

- On February 24 Claimant requested notice of which four ICTI witnesses would be deposed.  We responded on March 6, 2014 that "Respondent will depose Menachem Ash and Ira Greenstein in addition to Howard Jonas and Davidi Jonas" and we proposed deposition dates for the first week of April.  ICTI did not reply that it was not representing Ira Greenstein.

- On April 11, I followed up with an email to Mr. Laffey stating that I can take the four planned depositions as follows:
  - Ira Greenstein – May 1, 9:30-1:30
  - Menachem Ash – May 2, 9:00-1:00
  - Howard Jonas – May 5, 9:00-1:00
  - Davidi Jonas – May 5, 1:30-5:30

- On April 14, Mr. Laffey responded: "We can now confirm, subject to a final discussion we need to have with our witnesses after the holiday, our agreement on the deposition schedule set forth in our April 11th email exchange:
  - Jeff Ballabon – April 29, 9:30 (Shiboleth NYC)
  - Ira Greenstein – May 1, 9:30-1:30 (Reed Smith NYC)
  - Menachem Ash – May 2, 9:00-1:00 (Reed Smith NYC)
  - Howard Jonas – May 5, 9:00-1:00 (Reed Smith NYC)
  - Davidi Jonas – May 5, 1:30-5:30 (Reed Smith NYC)

  No mention was made that Ira Greenstein, who would be deposed at Reed Smith's offices, was not represented by Reed Smith or Boies Schiller.

- On April 28, after depositions had been adjourned, Mr. Laffey provided an updated deposition schedule:  "This is to confirm that the parties have agreed as follows:  As per Respondent's request, ICTI has agreed to adjourn Mr. Ballabon's deposition from tomorrow, April 29, to May 9, in accordance with the parties' agreement on the remaining deposition schedule set forth below:
  5/8 – Ira Greenstein
  5/9 – Jeff Ballabon
  5/13 & 5/20 – Menachem Ash, Davidi Jonas, Howard Jonas (we will be checking their schedules and let you know who will be deposed when)

14

5/22 (beginning early) – remaining time with Jeff Ballabon and/or Daniel Gelbtuch deposition

No mention was made that Ira Greenstein was not represented by Reed Smith or Boies Schiller.

- On Wednesday May 7, Mr. Greenstein told Mr. Ballabon, with whom he was engaged in settlement discussions on behalf of IDT, the company indemnifying ICTI, that he could not confirm his attendance at the May 8 deposition.  Mr. Greenstein stated that he was waiting for a waiver from IDT/ICTI so that he could retain his own counsel to represent him, having been "abandoned" by opposing counsel.  We emailed this to ICTI on May 7 seeking clarification and to know officially whether the next day's deposition was proceeding.

- Claimant responded to the May 7 email by informing us, *for the first time*, that it is adopting the position that it does not represent Mr. Greenstein, and asserting that it is Respondent's obligation to schedule and confirm Greenstein's deposition (oddly, at Reed Smith's offices).  Claimant stated that it informed Respondent of this fact prior to this email exchange, but beyond Mr. Greenstein's reports to Mr. Ballabon of this bizarre machination by Claimant's counsel, counsel in fact had never informed us or acknowledged any such stratagem or position.  We note that to this day, Counsel for Claimant refuses to explain what they mean when they claim not to represent Mr. Greenstein "in his personal capacity" since he is being deposed strictly in his corporate capacity – although the implicit threat to the witness is obvious.

- On May 16, I spoke to Ms. Aurora Cassirer, Mr. Greenstein's designated counsel.  She indicated that she had debriefed with Mr. Greenstein, but she needed to work out "representation issues" with IDT/Straight Path before we set the deposition.  When I notified Claimant, Claimant denied knowledge of any representation issues.

- On Wednesday May 28, Friday May 30, Monday June 2 and Friday June 6 we reached out to Ms. Cassirer to confirm deposition dates, but she would not speak about the case over the phone or respond to our emails.

**G O E T Z   F I T Z P A T R I C K** LLP
Attorneys at Law                              www.goetzfitz.com
One Penn Plaza, New York, NY 10119 | (T) 212-695-8100 | (F) 212-629-4013

Ronald D. Coleman
rcoleman@goetzfitz.com

September 2, 2014

**BY E-MAIL: michelegomez@adr.org**

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414

**Re:  Straight Path IP Group, Inc. v. Ballabon**
**AAA Case No. 13 166 02650 12_____**

Dear Arbitrator Feliu:

I write, first of all, to introduce myself and notify the AAA of my appearance as lead counsel for the Respondent. The Shiboleth firm remains counsel to Mr. Ballabon as well.

Substantively, we also write seeking a number of forms of relief or clarification, or, as the case may be, both.  In particular, we refer to the necessity of continuing the Ira Greenstein deposition which, as set forth more fully below, was improperly cut short; to address a number of (arguably related) open privilege issues; and to address scheduling in general.  We will address these in order.

**The Greenstein Deposition**

Last Wednesday, August 27, 2014, Respondent deposed Ira Greenstein, whose deposition had initially been scheduled for early May.  The delay was caused by an inexplicable -- or, at least, unexplained -- last minute reversal by Claimants, who at that time suddenly asserted that Mr. Greenstein was not a party representative.   Besides the unjustifiable delay of Mr. Greenstein's deposition caused by this tack, Claimant's change in posture only muddied the already murky waters concerning the real parties in interest in this matter, whose implications we discuss further below.



GOETZ FITZPATRICK LLP

Arbitrator Alfred G. Feliu
September 2, 2014
Page 2 of 5

During his long-delayed deposition last week, Respondent's counsel had carefully and appropriately developed the testimonial foundation required for questioning Mr. Greenstein on this issue when his counsel -- which we understand is being paid for by IDT -- abruptly terminated the deposition after only two hours on the record. This action prevented Respondent not only from pursuing the key issue of the parties in interest here but also precluded him from exploring other critical issues in this case, including matters as central as Claimant's purported "cause" for terminating Mr. Ballabon and damages.

The abrupt termination was prompted by Claimant's frequent obstructions on the basis of privilege, followed by contentious arguments on the record. After Claimant's counsel and Mr. Greenstein's counsel had several private discussions outside of the deposition room, Mr. Greenstein returned to the deposition room spooked and apparently unable to make sense of what he can or cannot testify to. Mr. Greenstein's attorney then terminated the deposition.[1]

The obstructions, the private conferences mid-deposition and the cutting off of questioning in the middle of a pending question were outrageous and unjustifiable, especially in light of the nearly four-month delay caused by Claimant's obstreperous refusal to produce Mr. Greenstein. In essence, Claimant's present position appears to be that, while it was ultimately agreeable not to stand in the way of Mr. Greenstein's giving his testimony, it reserved the right to continue doing so if anything he were to say on the record might be to its disadvantage.

In the limited time that we did have access to Mr. Greenstein his testimony was -- to the extent not obstructed by counsel[2] -- compelling:

- Mr. Greenstein confirmed that there were indeed representations to Mr. Ballabon and to Claimant's investors and potential investors -- as Mr. Ballabon has alleged -- that the patents were valued at ████████████ if separated from Jonas's control. (Greenstein Dep. at 87:10-89:20; 104:20-105:16.)
- Mr. Greenstein confirmed that the underpinning of the deal with Mr. Ballabon -- as Mr. Ballabon has alleged -- was that the company was being spun off as an independent public company, and not remaining an IDT subsidiary or under Jonas control.
- Mr. Greenstein confirmed that such representations were made to Mr. Ballabon, to potential investors, and to the SEC, and that the delay in spinning off destroyed the value of the agreement with Mr. Ballabon. (Greenstein Dep. at 62:14-65:2; 66:2-66:21).

---

[1] "MS. CASSIRER: I think we have arrived at the conclusion that this deposition is too contentious. There [are] a lot of issues that are unclear relating to the privilege and its impact on the testimony and what Mr. Greenstein may or may not testify to, so until those issues are clarified, Mr. Greenstein will no longer testify today. We need to get some clarity before he continues his testimony.  Thank you all."  (Greenstein Dep. at 115:2-12.)
[2] See, e.g., Greenstein Dep. at 47:11-58:23; 107:17-121:8.

 **GOETZ FITZPATRICK LLP**

Other relevant issues, however, including *inter alia* Mr. Ballabon's job performance, the strike price of the options, the ███████ issue, the circumstances of Mr. Ballabon's termination, and the invasion of Mr. Ballabon's personal emails during the course of this litigation, were **not** addressed when the deposition was improperly cut short.   Indeed, the facts and circumstances surrounding the termination of the deposition only raise more legitimate questions of central significance in this Arbitration.

The record reflects that Mr. Greenstein's attorney terminated the deposition after the witness stated on the record that he was "not comfortable . . . proceeding." That comment, however, came after several discussions that took place outside of the deposition room -- with **Claimant's counsel**.  (Greenstein Dep. at 108:8-121:7.)  Based on Claimant's position that Mr. Greenstein is not a party representative in this matter and its explicit refusal to represent him at the deposition or take responsibility for scheduling this deposition, that discussion is (a) not privileged and (b) obviously highly relevant.   Respondent should have been permitted at the very least to question Mr. Greenstein about the discussion he had with Claimant's counsel, to probe why he did not feel "comfortable" and to establish whether there was a bona fide basis for his attorney's unilateral cessation of questioning.

The unilateral adjournment of Mr. Greenstein's deposition cannot be justified. Respondent is entitled to Mr. Greenstein's full testimony because he is a key witness with respect to the fundamental issues in this Arbitration.  He has direct knowledge of facts and evidence that prove and disprove allegations in this case and, based on the limited nature of the testimony he was able to make before being "shut down," he is -- unlike the other IDT-affiliated[3] witnesses who have been deposed -- amenable to responding to straightforward questions with straightforward answers.

The prejudice to Mr. Ballabon caused by this conduct is palpable. Mr. Greenstein's deposition testimony will, by every indication, be of great significance with respect to the upcoming motions.  Moreover, Mr. Greenstein will be called at trial by Respondent, who is entitled to know how Mr. Greenstein will answer both Respondent's questions and the anticipated cross-examination by Claimants.  Respondent requests that the Arbitrator compel the continuation of Greenstein's deposition and allow for such time to complete his questioning as is reasonably necessary.[4]

---

[3] Greenstein testified that he was a board member of Claimant Innovative Communications Technologies, Inc. ("ICTI") from March 2011 to August 2011, and served as President and Treasurer of ICTI from March 2011 until July 2013.  He served as President of IDT Corp. ("IDT") from August 2001 to December 2011.  Since December 2011, he has been President of Genie Energy ("Genie"), another company implicated in this proceeding, as well as being "Counsel to the Chairman" of IDT in which position he performs investor relations among other advisory roles.  He has a written agreement with IDT, and he gets a 1099 from IDT and a W2 from Genie.  (Greenstein Dep. at 18:3-20:16.) All of these entities are corporations controlled by Howard Jonas. Greenstein also testified that he considers Howard Jonas to be a personal friend who he has known for twenty years and during which time he's acted as his counsel and advisor.  (Greenstein Dep. at 28:9-29:20.)

[4] Claimant may argue that Respondent's deposition time is almost up, which was not, of course, the reason given by Mr. Greenstein's counsel for ending the deposition.  But separate and apart from the substantial amount of time

 **GOETZ FITZPATRICK LLP**

### Claimant's Assertion of Privilege

To this date Claimant has asserted privilege regarding approximately 600 documents in Respondent's document production, but despite being aware that Respondent objects to the vast majority of these privilege designations, has failed to seek a ruling with the Arbitrator.  This lack of resolution concerning the status of key documents already caused a problem in connection with the ███████████████████████ over which Claimant did not seek a privilege ruling until after it already was cited in Respondent's expert report and which would have been a subject of Mr. Greenstein's testimony.  That assertion is nonetheless still being considered by the Arbitrator.

In light of all this, absent a ruling on privilege -- which Respondent respectfully submits should abide the continuation of Mr. Greenstein's deposition -- Respondent is unable to rely on these purportedly privileged documents either in support of its upcoming motion or in connection with the trial.  Moreover, Respondent is unable to anticipate which documents presently claimed as privileged by Claimant may or may not nonetheless be used by Claimant as it sees fit.  While the selective use and waiver of otherwise privileged documents may give rise to waiver of all related privileged documents (or others on which the same theory of privilege is based), it is not reasonable to require Respondent to operate in a vacuum on the matter.

Obviously the burden on a party asserting privilege is on that party where, as here, the assertion is contested.  It is certainly not proper to place on the objecting party any obligation to justify the use of otherwise relevant documents merely upon the other party's unsupported, and self-serving, assertion of privilege.  Nor need the Arbitrator be reminded of the great practical advantage to resolving core evidentiary questions, if not before substantive motion practice, certainly well in advance of a plenary trial or hearing.

But in this case in particular the unresolved evidentiary issues are inextricably linked to core questions of substance concerning, again, the identity of parties and the interrelationship among personnel and counsel.  Much of this would have been clarified by the deposition testimony sought, but prevented from occurring, at the Ira Greenstein deposition.  For this reason, we request that the Arbitrator order the continuation of the Greenstein deposition on a date certain and require Claimant to support its privilege claims by written submission no later than 10 days following the completion of that session.

---

during Mr. Greenstein's deposition that was chewed up by his counsel's improper speaking objections and monologues, Claimant has repeatedly flip-flopped on the issue of deposition time depending on whose ox is being gored.  Thus during Respondent's deposition of Howard Jonas, Claimant's counsel argued that each side was allowed only 14 hours (H. Jonas Dep., May 13 2014 at 169:4-169:21), thus enabling Jonas's questioning to be minimized.  During Claimant's deposition of Mr. Ballabon, however, Claimant's counsel reversed himself and interpreted the limitations expansively (i.e., as allowing each party 16 hours).  In the end, the plain fact is that Claimant has taken up over 15.5 hours of record time while Respondent was allowed far less before Mr. Greenstein's deposition was ended (Ballabon Dep., July 1, 2014 at 127:3-129:4).



**Scheduling**

Normally new counsel is, upon request, afforded by tribunal and adversary alike some reasonable opportunity, typically at least 30 days, to acquaint himself properly with a pending complex litigation or arbitration matter. New York courts have, in particular, placed great weight on the reasonableness of arbitrators' denial of requests for rescheduling for good cause when considering challenges to arbitrations.

We do request that courtesy here, but note that in the circumstances, it would appear that the matters set out above render the present motion and hearing schedule all but impossible anyway. Claimant should not be allowed to benefit from having essentially thwarted the giving of testimony by a key witness, Ira Greenstein, on the eve of the due date for substantive motions regarding which that testimony may well bear considerable significance. And there remains as well the outstanding but fundamental privilege dispute requiring a substantive, reasoned ruling with respect to Claimant's claim -- which Respondent considers baseless -- of broad privilege over hundreds of highly probative documents.

For these reasons, therefore, we request that the Arbitrator revisit the present schedule to allow both for the undersigned's integration into the case and to take the time to ensure that the outstanding issues that are of core significance to the claims and defenses of the respective parties -- indeed, including the very definition of those parties -- are resolved carefully and fairly. Respondent respectfully submits that, because of the importance of these issues, such resolution take place in a manner that duly records the parties' respective positions, i.e., by written submission, as well as the Arbitrator's reasoned resolution of each and every outstanding issue. This is the only way that substantive fairness and due process in the critical closing phase of such a complex and contentious proceeding can be achieved.

Thank you for your consideration.

Respectfully submitted,

GOETZ FITZPATRICK LLP

By: _Ronald D. Coleman_
      Ronald D. Coleman

SHIBOLETH LLP

Daniel S. Goldstein
Ilya Prokopets

# GOETZ FITZPATRICK LLP

**Attorneys at Law**          www.goetzfitz.com

One Penn Plaza, New York, NY 10119 | (T) 212-695-8100 | (F) 212-629-4013

Ronald D. Coleman
rcoleman@goetzfitz.com

October 30, 2014

**BY E-MAIL: michelegomez@adr.org**

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414

**Re:  Straight Path IP Group, Inc. v. Ballabon**
**AAA Case No. 13 166 02650 12_____**

Dear Arbitrator Feliu:

We write to raise a number of issues concerning evidence and procedural fairness on the eve of the hearing scheduled for next week.

The week prior to commercial arbitration is hectic and pressurized, and therefore Respondent understands why Claimant's pre-hearing brief could not have been filed by the midnight deadline yesterday.  What is less understandable however, is Claimant's service of documents which were subsequently designated as exhibits on Tuesday night.  As far-fetched as this practice sounds, it is even more ridiculous in light of the fact that these documents purport to be IDT board minutes, which as a legal matter cannot possibly have been "lost."  We write to ask the Arbitrator to rule that this last-minute production is out of time and these documents cannot be used at the hearing.  We reserve our right to seek sanctions for the unjustified withholding of this material.

We also note that numerous exhibits on Claimant's list consist of communications which, if they had been designated by Respondent, would surely have been objected to as attorney-client privileged.  (Examples attached.)  Clearly Respondent is attempting to use privilege as a sword and a shield.  Their designation of these attorney-client communications effectively waives virtually all privilege concerning communications among the same or essentially the same groups of people.  In light of that, we intend to supplement our designation of exhibits by the close of business tomorrow to include documents previously not considered by Respondent as eligible for use in the hearing but which, in light of this waiver, are no longer restricted.



Because of the lateness of the hour, this letter constitutes our notice to Claimant of these objections.

Respectfully submitted,

GOETZ FITZPATRICK LLP

By: Ronald D. Coleman

SHIBOLETH LLP

Daniel S. Goldstein
Ilya Prokopets



**G O E T Z  F I T Z P A T R I C K** LLP
Attorneys at Law      www.goetzfitz.com
One Penn Plaza, New York, NY 10119 | (T) 212-695-8100 | (F) 212-629-4013

Ronald D. Coleman
rcoleman@goetzfitz.com

November 17, 2014

**BY E-MAIL: michelegomez@adr.org**

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414

**Re:  Straight Path IP Group, Inc. v. Ballabon**
**AAA Case No. 13 166 02650 12**

Dear Arbitrator Feliu:

We write regarding the issue of rebuttal witnesses.

**I.  Timing**

The Arbitrator will recall that, at the end of the hearing on the Friday before last, November 7, it was revealed (inadvertently) that Claimant planned to call at least one "rebuttal" witness.  At the time, the Arbitrator suggested, off the record, that such witnesses be disclosed "by Monday."  It seemed clear that the Arbitrator's intention in ordering disclosure of any planned rebuttal witnesses was not to affirmatively promote the use of surprise in these proceedings, but on the contrary to ensure timely notice in the event there was some challenge so that the schedule would not be disrupted.  Trial by ambush is discouraged in modern litigation, and is all the more inimical to arbitration.  Nonetheless, I suggested that Tuesday (i.e., meaning the next Tuesday, November 10) would be sufficient notice in light of the fact that the next hearing would not take place until the Thursday, November 20th, and our adversaries agreed.

We heard nothing from Claimant by the Tuesday deadline or throughout the rest of last week, even though we were in contact regarding other scheduling matters relating to the final day.  Given the already ambitious schedule for November 20th and considering the Arbitrator's expressed wish to limit extra hearing days to one, we contacted Claimant last Friday seeking to confirm that no rebuttal witnesses would be called.  Claimant resisted any such disclosure, based on its claim that the Arbitrator's instruction and the parties' agreement to promptly identify rebuttal witnesses referred to **next** Tuesday – i.e., **tomorrow, November 18**.  Rather than



providing adequate notice, however, such timing would have left Respondent all of **one business day** to object to such a proffer, to resolve the issues discussed below or to prepare for the testimony of a witness previously shielded from discovery based on attorney-client privilege. Certainly this is not what the Arbitrator intended and not what the parties agreed to. (If this were in fact the case, obviously we would never have volunteered the extra business day, which only was a result of the original deadline being the Monday after our last hearing.)

After pressing Claimant and notifying that we intended to contact the Arbitrator regarding Claimant's refusal to identify its new witness, who by all indications had already been decided upon at least by Friday, November 7th, Claimant finally advised us on Friday afternoon that it indeed planned to call a "rebuttal" witness:  Dov Schwell, Claimant's outside counsel.

The identity of the witness explains much about why Claimant refused to reveal it.  We address our objections to the proffer of Mr. Schwell below, but must note that Claimant's efforts to avoid such a controversial disclosure until the last minute can only have been intended to prevent Respondent from seeking and achieving full consideration of the issues raised by his proposed testimony.

We note as well that Claimant has declined to specify the substance of Mr. Schwell's "rebuttal" testimony to the extent that the justification for his testimony can be divined, which suggests that it is no more than an attempt to shore up or rehabilitate testimony already given by previous witnesses and to have the last word even after closing its own affirmative case.

## II.     Claimant's Rebuttal Witness

Dov Schwell is the long-time outside legal counsel for IDT and its many affiliates, including Claimant.  Mr. Schwell has **never**, at any point in this proceeding, been identified as a witness or potential witness by Claimant. Furthermore, because Claimant has taken the position that his function is entirely legal and because Claimant has insisted that the vast majority of documents evidencing his involvement be redacted, excluded, or clawed back, Respondent has understood, notwithstanding Mr. Schwell's first-hand knowledge of relevant facts, that he would not be available to give testimony (see further below) and thus he was not deposed.

It must be noted that even if the naming of this particular witness were uncontroversial or if he had even been previously identified as a possible witness, Claimant has not identified any "surprise" evidence evinced by Respondent during the hearing that would warrant rebuttal testimony by **anyone**.  Rather, it appears that Claimant simply wishes to call a friendly witness and have the last testimonial word after already having had the first word.  It seeks to do this by placing on the stand someone it has "hidden in plain sight," i.e., one whose involvement in these matters has always been known but who has in essence been sequestered beyond Respondent's reach from the start.

Indeed, as shown below, Claimant has continually asserted extensive, wide-ranging attorney-client privilege over Mr. Schwell's communications, and has redacted and even clawed



back communications it has produced, sealing off Mr. Schwell from discovery. As tiring as the metaphor may be by now in this matter, Claimant's brash use of the attorney-client privilege as both a sword and shield has, with this development, reached an all-time-high level of audacity. We briefly review the extent to which the "shield" has been utilized by Claimant in this Arbitration below, and make out the relief sought by Respondent afterward.

### A. Privilege and Discovery

The record is undisputed that throughout the entire period of this dispute and for many years prior to it, Dov Schwell's role with respect to ICTI was solely outside legal counsel. For this reason virtually all of Mr. Schwell's communications have been treated as off limits to Respondent up to this point – even where it is plain from their content that they do not represent the seeking or rendering of legal advice. The extent to which Claimant has **vigorously** asserted this privilege over his communications cannot be overstated. For example, in response to Respondent's argument that Mr. Schwell's communications were not entirely privileged during an earlier dispute concerning privilege, Claimant stated as follows in a letter to the Arbitrator dated September 24, 2014:

> Respondent mistakenly contends that documents wherein ICTI and IDT's in-house counsel corresponds with company counsel [Dov Schwell] regarding corporate issues are not privileged. This position turns on an improperly restrictive view of what constitutes legal advice, and appears to be premised on the groundless assumption that corporate counsel to ICTI [Dov Schwell] dispensed only business advice. Respondent's argument is obviously wrong, and the Corporate Counsel Documents [Schwell's documents] are protected from disclosure under the attorney-client privilege. . . . Schwell's advice, as company counsel, regarding what the company should do, from a legal standpoint, in order to alter, revise, or otherwise establish equity grants to certain of its employees is privileged. Importantly, the fact that such discussions also have some element of business advice, does not, by itself, eliminate the privileged nature of the documents.

(C. Laffey Letter to Arbitrator Feliu, dated September 24, 2014, at 8.) In addition to its robust assertions of privilege over Mr. Schwell's communications, which have been substantially upheld by the Arbitrator, and its exclusions of such communications from discovery, Claimant has redacted the vast majority of his communications which have been produced, many of which appeared to pertain to critical factual issues. Respondent was substantially prejudiced by being restricted from virtually any use of such communications, even when they were produced by Claimant and belatedly "clawed back" from production based on Claimant's vociferous insistence of the profound privilege issues at stake concerning anything written to or by Dov Schwell.

To be clear, Mr. Schwell was never identified by Claimant as a "may call" or "will call" witness, and, while Respondent would have been very interested in his deposition, there has



never been the slightest question of being allowed to have it because of Claimant's position on privilege. (Indeed, Claimant even argued that Respondent himself could not respond to direct questions at deposition if such responses contained information gained from conversations with Claimant's lawyers, including Mr. Schwell.)

Claimant's present tack, however – after gaining every conceivable benefit from its broad conception of privilege – is to utilize Mr. Schwell as a witness, selectively waiving privilege with respect to only the "helpful" aspects of his knowledge and to do so after all other testimony is in on the spurious ground of "rebuttal."  As the Arbitrator is well aware, however, rebuttal witnesses are not intended as vehicles for a party to open up a new opportunity for direct examination.  They are allowed solely to address factual, i.e., evidentiary issues **not anticipated before the hearing**.  There is no basis for such testimony here.

That this is the case may be inferred from Claimant's unhelpful description of Mr. Schwell's testimony as "address[ing] several topics about which [Respondent's] witnesses testified he had involvement."  But these "topics," and the respective parties' testimony about them, have been known to all involved in this proceeding for months, if not years.  If there are any proper grounds for rebuttal testimony, Claimant is refusing to articulate them, let alone any justification for the introduction of their attorney for "last licks" testimony.

Mr. Schwell, again, is Claimant's outside legal counsel.  The record is clear that he has made the vast majority of his income through engagements with IDT-affiliated companies since he left his in-house position.  Thus, absent a specific justification for offering him as a rebuttal witness, it is a foregone conclusion that Mr. Schwell's testimony will merely mirror previous testimony offered by Claimant. Because, unlike other witnesses presented by Claimant, Mr. Schwell has never been made available for deposition, he will be effectively unimpeachable concerning any "new facts" he can be counted on to "reveal" to bridge those often yawning factual chasms. Also, unlike Claimant's other witnesses, Mr. Schwell – a skilled attorney – will benefit from weeks of preparation with the transcripts of all prior testimony.

Claimant's intention to call Mr. Schwell as a witness **might** be defensible if Claimant identified Mr. Schwell as a witness at the outset; if Respondent otherwise had an opportunity to depose him; if Claimant had ever produced a privilege log of his communications; if Respondent had been afforded a reasonable opportunity to address the assertion of privilege over his specific communications in light of his anticipated testimony; or if, even lacking all this, he been called to buttress Claimant's story during its case in chief.

But none of these things happened.  Even absent Claimant's planned "Tuesday surprise" on the eve of the resumption of proceedings, Respondent submits that allowing Mr. Schwell's testimony would be manifestly improper and prejudicial to Mr. Ballabon as a matter of fairness and as a matter of law. The proposed "rebuttal" by this "privileged" witness should not be permitted solely because of the treatment of his prior communications as privileged,  a shield that has, at every juncture here, been employed for no other purpose than to obscure the truth.  In what Respondent hopes is the unlikely event that the Arbitrator would nonetheless permit such



GOETZ FITZPATRICK LLP

testimony, Respondent urges that it take place only after Mr. Schwell's prompt deposition, at which he would be subject to questioning concerning all relevant facts without respect to privilege.  Moreover, in such an event, all relevant documents and emails that have been redacted because of Mr. Schwell's involvement should be unredacted or, if they were withheld, produced, including materials that were supposedly "clawed back."

**B.  <u>Conclusion</u>**

Mr. Schwell should not be allowed to testify for innumerable reasons, which may be summarized as follows:  (1) There is no basis for his testimony under the rules governing rebuttal witnesses; (2) he has never been identified as a witness despite his known involvement in the matters at hand; (3) his past statements and present recollection have at all times been surrounded by a thorny hedge of purported privilege.  If, however, some basis were found – and, again, Respondent urges that there is no basis – to permit his testimony, Respondent should be permitted to have his deposition beforehand, and to enter documents previously withheld on the basis of privilege due to his legal role in as author or recipient into evidence as well as to use them in Mr. Schwell's cross-examination.

Respectfully submitted,

GOETZ FITZPATRICK LLP

By: _____
     Ronald D. Coleman

SHIBOLETH LLP

Daniel S. Goldstein
Ilya Prokopets

cc:  All Counsel



# G O E T Z  F I T Z P A T R I C K LLP
Attorneys at Law    www.goetzfitz.com
One Penn Plaza, New York, NY 10119 | (T) 212-695-8100 | (F) 212-629-4013

Ronald D. Coleman
rcoleman@goetzfitz.com

December 12, 2014

**BY E-MAIL: michelegomez@adr.org**

Arbitrator Alfred G. Feliu
c/o Michele Gomez
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914-1414

**Re:  Straight Path IP Group, Inc. v. Ballabon**
**AAA Case No. 13 166 02650 12**

Dear Arbitrator Feliu:

We write regarding Claimant's assertion of privilege over documents that were sent or received by Dov Schwell.  The subjects within these documents were directly addressed by Mr. Schwell on his direct examination.  When we objected to Mr. Schwell's testifying about subjects over which privilege had been asserted, for example the negotiation of Mr. Ballabon's employment agreement, Claimant's counsel argued on the record that, "The testimony I am offering is testimony between Mr. Schwell and Mr. Ballabon and his counsel concerning the negotiation of the terms of his employment. Those are not privileged discussions"; to which I agreed.

Upon further review (and we remind the Arbitrator we had literally two hours' prior notice of the subjects to which Mr. Schwell was brought in to testify), we have identified three documents that were either not originally produced as exhibits or were "clawed back" (i.e., produced by Respondent and ruled privileged in the middle of arbitration), which tie directly to the questions and answers during Mr. Schwell's direct examination.  We request that these three documents be admitted into evidence.

First, Mr. Schwell was asked whether it was his "understanding based on those discussions at the time the Employment Agreement was signed that Mr. Ballabon's agreement was conditioned on ICTI being spun off into a public company?"  (Schwell Tr. at 1892.)  The following two emails go directly to Mr. Schwell's "understanding," as they contain his own communications concerning the spin off and Mr. Ballabon's employment agreement.



Arbitrator Alfred G. Feliu
December 12, 2014
Page 2 of 2

████████████████████████████████████████████████████████████████████ Because this document
concerns subject matter that was directly addressed by Mr. Schwell on direct, it can no longer be
a "privileged" communication.

████████████████████████████████████████████████████████████████████ This
document concerns the same subject matter of Mr. Schwell's testimony.

██████████████████████████████████████████████████████████████████ Both Dov Schwell and
Menachem Ash testified about their understanding of the fair market value of ICTI per the
employment agreement – namely that IDT had obtained an independent valuation by CRA and
the strike price "was to be based upon that."  (*See* Tr. Schwell at 1896-1899; *see also* Ash Tr. at
452: "Q. [I]s it your position that prior to the initiation of the arbitration the fair market value
was known and understood by everyone?  A. It was known and understood by IDT.").  Yet this
testimony is rebutted by RESPONDENT 03857, containing emails that address this very issue, in
which ██████████████████████████████████████████████████████████████████████

        Accordingly, Respondent should be permitted to use these documents and submit them
into evidence.

                                        Respectfully submitted,

                                        GOETZ FITZPATRICK LLP


                                By:     _____
                                        Ronald D. Coleman

                                        SHIBOLETH LLP

                                        Daniel S. Goldstein
                                        Ilya Prokopets

    cc:  All Counsel

[FILING OF REDACTED VERSION OF EXHIBIT I PENDING]